UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| HEATHER L. WELK, SUSIE B. JONES, WILLIAM BIGELOW, CHRISTINE HEINZMAN, MARK HEINZMAN, SIGMOND SINGRAMDOO, TROY FORTE, LYNN M. FORTE, DAVID J. ROSTER, CHARITY ROSTER, PATRICK RUCCI, GARY G. KLINGNER, REBECCA A. ALBERS, IAN PATTERSON, JAMES WILLIS KONOBECK, JR., ALISON KONOBECK, AMY B. TIBKE, DANE A. TIBKE, TRACY J. MIKLAS, MICHELLE L. MIKLAS, | Case No. 11-CV-2676 (PJS/JJK) |
| Plaintiffs, | ORDER |
| v. | |
| GMAC MORTGAGE, LLC; ALLY FINANCIAL, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; MERSCORP, INC.; U.S. BANK, N.A.; DEUTSCHE BANK TRUST COMPANY AMERICAS; SHAPIRO & ZIELKE, LLP; U.S. BANK NATIONAL ASSOCIATION ND; DEUTSCHE BANK NATIONAL TRUST COMPANY; THE BANK OF NEW YORK MELLON, f/k/a The Bank of New York, | |
| Defendants. | |

William B. Butler, BUTLER LIBERTY LAW, LLC; Susanne M. Glasser, GLASSER LAW LLC, for plaintiffs.

Charles F. Webber, Trista M. Roy, FAEGRE BAKER DANIELS LLP, for defendants GMAC Mortgage, LLC; Ally Financial, Inc.; MERSCORP, Inc.; Deutsche Bank Trust Company Americas; and The Bank of New York Mellon.

Kirstin D. Kanski, William P. Wassweiler, LINDQUIST & VENNUM PLLP; Charles F. Webber, Trista M. Roy, FAEGRE BAKER DANIELS LLP, for defendant Mortgage Electronic Registration Systems, Inc.

Brian L. Vander Pol, DORSEY & WHITNEY LLP; Charles F. Webber, Trista M. Roy, FAEGRE BAKER DANIELS LLP, for defendants U.S. Bank, N.A.; U.S. Bank National Association ND.

Amanda M. Govze, Kristine M. Spiegelberg Nelson, SHAPIRO & ZIELKE, LLP, for defendant Shapiro & Zielke, LLP.

Frederick S. Levin, DYKEMA GOSSETT LLP; Kirstin D. Kanski, William P. Wassweiler, LINDQUIST & VENNUM PLLP; Jared D. Kemper, FOLEY & MANSFIELD, PLLP, for defendant Deutsche Bank National Trust Company.

In recent years, the federal courts have been inundated with lawsuits brought by homeowners challenging the foreclosures of the mortgages on their homes. Some of these lawsuits are meritorious, but many are not, and quite a few are frivolous. The most common type of frivolous lawsuit is premised on what judges often refer to as the "show-me-the-note" theory.

In every mortgage transaction, the borrower signs both a note (in which she promises to repay the loan) and a mortgage (in which she pledges her home as security for her promise to repay the loan). Historically the lender held both the note and the mortgage. Since the 1990s, however, it has become common for the note and the mortgage to be held by different entities. Often, the note is held by the lender (or by someone who bought the note from the lender), while the mortgage is held by (and recorded in the name of) a nominal mortgagee such as defendant Mortgage Electronic Registration Systems, Inc. ("MERS"). This system allows loans secured by mortgages to be sold and resold multiple times without the necessity of recording each sale on the title of the mortgaged property.

A plaintiff bringing a show-me-the-note claim generally argues that, because the entity that holds her mortgage (say, MERS) is not the same as the entity that holds her note (say, U.S. Bank), the mortgage on her home or the foreclosure of that mortgage is invalid. This argument is

frivolous when made under Minnesota law.  Indeed, this argument has been rejected by the Minnesota Supreme Court, by the United States Court of Appeals for the Eighth Circuit, and by every federal judge sitting in Minnesota who has addressed the argument.  All of these courts have held — clearly, repeatedly, and recently — that, under Minnesota law, the entity that holds the mortgage can foreclose on the mortgage even if that entity does not also hold the note.

Unfortunately, neither the number nor clarity of these judicial decisions has stopped plaintiffs from continuing to bring show-me-the-note lawsuits.  Many of these lawsuits are brought by plaintiffs who represent themselves.  Some of these plaintiffs seem to be desperate homeowners who have searched the Internet for a way to save their homes from foreclosure, run across websites touting unconventional legal theories, and been persuaded of the merit of the show-me-the-note theory.  Other plaintiffs seem to be homeowners who fully understand that the show-me-the-note theory is frivolous but who are simply looking for a way to tie up their mortgagees in court, postpone the inevitable foreclosures, and live rent-free in their homes for months or even years.

In Minnesota, however, the bulk of the show-me-the-note claims that have recently been filed have been brought not by desperate homeowners representing themselves, but by attorney William B. Butler of Butler Liberty Law, LLC.  In fact, Butler has made a cottage industry out of filing frivolous show-me-the-note actions.  Butler attracts clients through a website that blatantly misrepresents Minnesota law and attacks the legal system, the banking system, and other targets. Butler has been quite successful in attracting clients, who either do not know or do not care that he has never actually won a show-me-the-note claim.

This is one of a series of nearly 30 cases that Butler has filed — on behalf of a total of perhaps a couple of hundred plaintiffs — in which he has challenged the validity of the mortgages on his clients' properties.  One of the first show-me-the-note lawsuits brought by Butler challenged the foreclosure of the mortgage on his own home.  *Butler v. Bank of Am., N.A.*, No. 11-461 (DWF/TNL), 2011 WL 2728321 (D. Minn. July 13, 2011).  Since bringing that lawsuit, Butler has refined his methods and has now settled into a familiar pattern:

Butler takes a group of a dozen or so individuals who are facing foreclosure but otherwise have no connection to one another; he gins up a dozen or so claims against a dozen or so defendants grounded mostly on the show-me-the-note theory; he improperly packages these claims into a single state-court action; and he fraudulently joins a single nondiverse defendant (typically a law firm that represented one of the lenders in foreclosure proceedings) in an attempt to block removal to federal court.  The defendants generally remove the cases to federal court, and Butler then moves to remand.  If the judge denies Butler's motion, he might "remand" the case himself by voluntarily dismissing it and refiling it in state court within a day or two, thereby starting the process all over again.  Butler might also "judge shop" in the same manner; if he does not like his chances before a particular federal judge, he might voluntarily dismiss his case, promptly refile it in state court, and start the process all over again.  To hide his conduct, Butler will reorder the names of the plaintiffs or substitute a new plaintiff for one of the old plaintiffs, so that the refiled case will have a different caption.

When Butler's claims are finally challenged on the merits, he makes false representations and spins out contradictory and often absurd arguments in the apparent hope that their sheer weight and number, multiplied by the number of parties and claims, will overwhelm his

opponents and the court.  Butler makes claims in his briefs that do not appear in his pleadings; he makes claims during hearings that do not appear in either his briefs or his pleadings; and, when ordered to show cause why he should not be sanctioned, he makes claims in his response that he did not make during the hearing or in his briefs or pleadings.  Of course, while all of this drags on month after month, Butler collects fees from his clients, and his clients live rent-free in their homes.

This matter is before the Court on numerous motions, including defendants' motions to dismiss and for sanctions, plaintiffs' motions to remand, and the Court's order to show cause why Butler should not be sanctioned under Fed. R. Civ. P. 11.  For the reasons stated below, the Court:

(1)     grants defendants' motions to dismiss, but stays the dismissal of plaintiff Heather Welk's claims pending further briefing on the issue of prior exclusive jurisdiction;

(2)     denies plaintiffs' first and second motions to remand, except to the extent that the second motion pertains to Welk's claims;

(3)     orders Butler to pay a sanction of $50,000 to the Court pursuant to Fed. R. Civ. P. 11;

(4)     orders Butler to pay a portion of defendants' attorney's fees pursuant to 28 U.S.C. § 1927;

(5)     orders that plaintiff Sigmond Singramdoo's proposed amended complaint be severed and that Singramdoo pay a civil filing fee of $350; and

(6)     denies Singramdoo's motion for a temporary restraining order as moot.

## I. MOTIONS TO DISMISS

Ordinarily, the Court would address plaintiffs' motions to remand before addressing defendants' motions to dismiss.  After all, a court cannot rule on the merits of a claim before first

satisfying itself that it has jurisdiction over that claim.  In this case, though, plaintiffs' motions to

remand largely turn on defendants' argument that the one nondiverse defendant has been

fraudulently joined to defeat federal jurisdiction.  Consideration of defendants' fraudulent-joinder

argument requires consideration of the merits of the claims made against the nondiverse

defendant — and that, in turn, requires a thorough understanding of the nature of plaintiffs'

claims.  The Court will therefore address the merits of plaintiffs' claims, and then turn to

plaintiffs' motions to remand.

### A.  Standard of Review

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept as

true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's

favor.  *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  But the plaintiff must

do more than offer "labels and conclusions" or a "formulaic recitation of the elements of a cause

of action . . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, the

"[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."

*Id.*

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings,

a Rule 12(b)(6) motion must be treated as a motion for summary judgment.  Fed. R. Civ.

P. 12(d).  But the court may consider exhibits attached to the complaint and documents that are

necessarily embraced by the complaint without converting the motion into one for summary

judgment.  *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).  In addition, the

court may consider public records on a motion to dismiss.  *Levy v. Ohl*, 477 F.3d 988, 991 (8th

Cir. 2007).

### B.  Plaintiffs' Show-Me-the-Note Argument

Plaintiffs are all Minnesota homeowners whose properties are subject to recorded mortgages held by one of the defendants.  Claiming that the mortgage liens on their properties are invalid, plaintiffs bring a total of 13 claims against a group of lenders, mortgage holders, and mortgage servicers, as well as Shapiro & Zielke, LLP ("Shapiro"), a Minnesota law firm that conducted non-judicial foreclosures on 6 of the 14 properties at issue in this case.

This much is uncontested:  Every one of the plaintiffs borrowed money from a lender to buy a piece of property; every one of the plaintiffs signed a note promising to repay the loan; every one of the plaintiffs also signed a mortgage pledging his or her property as security for the promise to repay the loan; every one of the plaintiffs failed to repay the loan as promised and thus is in default on his or her note; and every defendant who attempted to foreclose on the property of a plaintiff held record title to the mortgage in question.[1]  Hr'g Tr. 6-10, Jan. 20, 2012, ECF No. 95.  In a broad sense, then, not one of the plaintiffs to this action has suffered an injustice.  They promised to repay money, they pledged their properties as security for their

---

[1]At oral argument, the Court inquired whether the entities that were mortgagees of record on the Albers, Rucci, and Tibke properties were the same as the entities that had initiated foreclosure proceedings against those properties. Hr'g Tr. 116-17, 121, Jan. 20, 2012, ECF No. 95.  The parties' briefs had created some uncertainty about that issue.  But plaintiffs admitted — and the public records submitted in connection with defendants' motions confirm — that the mortgagees of record for all the properties at issue in this case (including the Albers, Rucci, and Tibke properties) were indeed the entities who initiated foreclosure.  *See* Kanski Decl., Dec. 9, 2011, ECF No. 47 [hereinafter "Kanski Decl."] Exs. 2-5 (recorded mortgage, assignment, foreclosure notice, and sheriff's certificate for the Albers property); *id.* Exs. 7-10 (recorded mortgage, assignment, foreclosure notice, and sheriff's certificate for the Tibke property); Kemper Decl. Exs. 1-4 (recorded mortgage, assignment, foreclosure notice, and sheriff's certificate for the Rucci property).  Plaintiffs do not take issue with the chain of title to the mortgages — and the record reveals that, for each plaintiff, there is a complete recorded chain of title from the original mortgagee to the foreclosing entity.

promises, they failed to repay the money as promised, and thus they should lose the properties that they pledged as security.

The plaintiffs insist, though, that they have found a loophole.  According to plaintiffs, because the defendants who hold the mortgages on their properties — and who have initiated foreclosure proceedings against those properties — do not also hold the notes that are secured by those mortgages, the mortgages are not valid and the defendants have no right to foreclose.  *See, e,g.*, Am. Compl. ¶ 27 ("All Plaintiffs are Minnesota homeowners who allege that Defendants assert invalid and voidable Mortgages ("Mortgages") against Plaintiffs' homes."); *id.* ¶ 40 ("Defendants do not have valid, clear legal title to the Original Notes.  Defendants therefore . . . cannot assert the right of foreclosure under the Mortgages. . . . Because Defendants have no direct right to receive payments due on the Original Notes, Defendants cannot exercise foreclosure rights in the Mortgages."); *id.* ¶¶ 51, 55, 59, 61, 65, 68, 70, 72, 74, 76, 79, 82, 85, 87 (alleging, with respect to each property, that "[b]ecause Defendant has no right, title or interest in [plaintiff's] Original Note, Defendant cannot exercise rights in the security instrument securing payments in the Original Note"); ECF No. 58 at 6 (claiming that a decision by the Eighth Circuit bankruptcy appellate panel "resoundingly disposes of the notion that a mortgagee who does not hold the note but only the mortgage has a valid lien on real property").[2]

---

[2]At oral argument, plaintiffs clarified that they are challenging the validity of the mortgages because defendants neither hold the notes themselves nor are acting as agents for the entities that do hold the notes. Hr'g Tr. 11-12.  As discussed below, both of these challenges are frivolous.  For simplicity's sake, references by the Court to plaintiffs' allegation that defendants do not hold the notes are also intended to encompass plaintiffs' allegation that defendants are not authorized agents of the note holders.

This is the "show-me-the-note" argument, and, as already mentioned, this argument has been rejected by every federal and state court that has considered it under Minnesota law.  Most notably, this argument was definitively rejected by the Minnesota Supreme Court in *Jackson v. Mortgage Electronic Registration Systems, Inc.*, 770 N.W.2d 487 (Minn. 2009).  Plaintiffs argue, however, that *Jackson* should be read narrowly to hold only that a transfer of a note does not need to be recorded on the title of the property pledged as security for the note.

It is true that the certified question answered in *Jackson* was whether Minnesota's foreclosure-by-advertisement statute requires that the transfer of a note be recorded when the mortgage securing the note has not also been transferred.  *Id.* at 493.  The Minnesota Supreme Court held that the answer to that question is "no."  *Id.* at 489-90.  But this is not, as plaintiffs contend, the *only* holding in *Jackson*.  In order to answer the certified question, the Minnesota Supreme Court had to decide a number of subsidiary questions of state law, and the court's answer to each of those subsidiary questions is also a holding.  What the United States Supreme Court said about its own opinions is true of the opinions of any appellate court, including the Minnesota Supreme Court:  "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).  Thus, *Jackson* contains numerous holdings regarding Minnesota law that are binding both on lower state courts and on federal courts applying Minnesota law.  *See Integrity Floorcovering, Inc v. Broan-Nutone, LLC*, 521 F.3d 914, 917 (8th Cir. 2008) ("In resolving any substantive issues of state law, we are bound by the decisions of the Minnesota Supreme Court.").

In order to decide whether it is necessary to record the transfer of a note when the mortgage securing the note is not also transferred, the *Jackson* court first had to decide whether Minnesota law permits one entity to own a note and a different entity to own the mortgage securing that note. The *Jackson* plaintiffs explicitly argued — just as plaintiffs argue in this case — that such a split in ownership is not permissible: "[P]laintiffs argue that a mortgagee cannot hold legal title to a mortgage unless that mortgagee also has at least some interest in the underlying indebtedness. For this reason, plaintiffs argue that MERS cannot hold legal title." *Jackson*, 770 N.W.2d at 498-99. The Minnesota Supreme Court expressly rejected the plaintiffs' argument: "Our case law establishes that a party can hold legal title to the security instrument without holding an interest in the promissory note." *Id.* at 500.

In explaining its holding, the Minnesota Supreme Court carefully described the differences between legal, record, and equitable title to a mortgage; explained that the entity that holds the note also holds equitable title to the mortgage; explained that such equitable interests in the mortgage do not need to be recorded; and explained that only the legal title to the mortgage must be recorded for the holder of that legal title to be able to foreclose by advertisement. *Id.* at 501. The court flatly rejected the core argument made by plaintiffs in this case and in every show-me-the-note case: that an entity that holds only legal and record title to the mortgage — and not equitable title — cannot foreclose. Indeed, the Minnesota Supreme Court held that *only* the holder of legal and record title (or someone acting on that holder's behalf) can foreclose. *Id.* at 500 ("'the power of sale must be exercised in the name of the party who has the legal title to the instrument'" (quoting *Burke v. Backus*, 53 N.W. 458, 459 (Minn. 1892)).

The Minnesota Supreme Court expressly acknowledged that its holding could give rise to disputes between the entity that holds a note secured by a mortgage (i.e., the entity that holds equitable title to the mortgage) and the entity that holds the mortgage itself (i.e., the entity that holds legal and record title to the mortgage). Such disputes can arise because the mortgage holder has the power to foreclose, but the note holder has an equitable right to the proceeds of the foreclosure. The Minnesota Supreme Court made clear, however, that the potential or reality of disputes between the holder of the equitable title and the holder of the legal and record titles do not render the mortgage invalid or in any way preclude foreclosure by advertisement: "[A]ny disputes that arise between the mortgagee holding legal title and the assignee of the promissory note holding equitable title do not affect the status of the mortgagor for purposes of foreclosure by advertisement." *Id.* at 501. In other words, contrary to plaintiffs' argument, it is not necessary that the mortgage holder get the permission of the note holder to foreclose; if the mortgage holder forecloses against the wishes of the note holder, that is a dispute for those parties (and only those parties) to resolve.

*Jackson* thus made abundantly clear that (1) an entity need not hold any interest in a note in order to hold legal and record title to the mortgage securing the note; (2) the holder of legal and record title to the mortgage may foreclose by advertisement — indeed, it is the *only* entity that may foreclose by advertisement — even if a different entity holds the note; and finally (3) a mortgagor cannot challenge a foreclosure on the basis that there might be a dispute between the legal and record holder of the mortgage, on the one hand, and the equitable holder of the mortgage, on the other hand.

This understanding of *Jackson* has recently been embraced by the Eighth Circuit in *Stein v. Chase Home Finance, LLC*, 662 F.3d 976, 980 (8th Cir. 2011).  In that case, the plaintiffs were represented by none other than Butler, who made before the Eighth Circuit precisely the arguments about *Jackson* that he is making before this Court, only to have the Eighth Circuit reject those arguments.  *See* Appellant's Brief at 20, *Stein v. Chase Home Fin., LLC*, 662 F.3d 976 (No. 11-1292), 2011 WL 1352258, at *20 ("Because the only entity entitled to enforce the note is the holder of the note, JPMorgan Chase Bank N.A. was the only entity who had the legal right to foreclose on the property."); *Stein*, 662 F.3d at 979-80.

The fact that the Eighth Circuit rejected Butler's show-me-the-note theory has not deterred Butler from continuing to file dozens of claims based on that theory.  Nor has Butler been deterred by the fact that his show-me-the-note theory has been rejected by every federal judge that has addressed it to date.  *See Jerde v. JPMorgan Chase Bank, N.A.*, No. 11-2666 (PAM/FLN), 2012 WL 206271, at *3 (D. Minn. Jan. 24, 2012); *Murphy v. Aurora Loan Servs., LLC*, No. 11-2750 (ADM/JJK), 2012 WL 104543, at *2 (D. Minn. Jan. 12, 2012); *Iverson v. Wells Fargo Bank, N.A.*, No. 11-2225 (MJD/AJB), 2011 WL 6065358, at *3 (D. Minn. Oct. 25, 2011); *Larsen v. Bank of Am., N.A.*, No. 11-1775 (MJD/JSM), 2011 WL 6065426, at *5-7 (D. Minn. July 21, 2011); *Butler v. Bank of Am., N.A.*, No. 11-461 (DWF/TNL), 2011 WL 2728321, at *5 (D. Minn. July 13, 2011).

At the hearing in this case, the Court pressed Butler to explain how he can continue to bring show-me-the-note claims after the theory underlying those claims has been so soundly rejected by the Minnesota Supreme Court in *Jackson*, by the Eighth Circuit in *Stein*, and by the judges of this District in multiple cases.  Butler responded by citing the decisions of three state

judges that, he claimed, embraced his views.  In fact, though, two of the three decisions cited by

Butler explicitly *reject* his theory, and the third[3] says not a word about it.

In one of the cases relied on by Butler — *Oppong-Agyei v. Chase Home Finance LLC*,

No. 19HA-CV-11-3026, slip. op. at 11-12 (Minn. Dist. Ct. Oct. 18, 2011) — Judge Edward

Lynch held:

> Defendants are not required to possess the original note in order to
> initiate a foreclosure by advertisement as long as they have legal
> and record title to the mortgage, *Jackson v. Mortgage Electronic*
> *Registration Systems, Inc.*, 770 N.W.2d 487 (Minn. 2009).
> Counts I, IV, V[,] VII, XVII, XVIII and XXI of Plaintiffs'
> Complaint are all based on the premise that Defendants must
> possess the original notes before they may foreclose the mortgages
> that encumber Plaintiffs' properties and should be dismissed.

This, again, is a case that Butler says *supports* his show-me-the-note theory.

Butler says the same of *Wollmering v. JP Morgan Chase Bank, N.A.*, No. 27-CV-11-

2383, slip. op. at 7, 9 (Minn. Dist. Ct. May 20, 2011), in which Judge Lloyd B. Zimmerman said:

> Plaintiffs' theory that the mortgages in this case are invalid and
> unenforceable because the mortgages have become separate from
> the notes, and that the Defendants are not able to prove ownership
> of the Notes, appears untenable as a matter of law, because it is the
> security interest in a mortgage — separate from the Note — that
> gives the right to foreclose by advertisement. . . .
>
> The Plaintiffs' argument that a mortgagee must demonstrate a right
> to enforce the note and not simply the mortgage disregards the
> plain language of *Jackson*.

---

[3]*Cartier v. Wells Fargo Bank, N.A.*, No. 62-CV-11-817 (Minn. Dist. Ct. July 21, 2011)
(order granting in part and denying in part defendants' motions to dismiss without discussing
whether it is necessary for a mortgagee to hold the underlying promissory note under *Jackson*).
The three decisions are in the record as exhibits to Butler's January 13, 2012 affidavit [ECF
No. 88].

Butler does rely on one other case: the decision of the United States Bankruptcy Appellate Panel for the Eighth Circuit in *In re Banks*, 457 B.R. 9 (B.A.P. 8th Cir. 2011). *Banks* was an adversary proceeding in which the debtors sought, among other things, to avoid the claimant's mortgage lien on their residence. *Id.* at 10. The bankruptcy court granted summary judgment in favor of the claimant, who alleged that it owned both the note and the mortgage. *Id.* On appeal, the parties' arguments focused on whether there was a break in the chain of title to the *mortgage*. The debtors did not make a show-me-the-note argument; in other words, unlike plaintiffs in this case, the debtors did not argue that the claimant could not foreclose because it did not own the *note*. *See* Brief of Plaintiffs-Appellants at 9, *In re Banks*, 457 B.R. 9 (No. 11-6025) (arguing that there was a break in chain of title to the mortgage); Brief of Defendant-Appellee at 5, *In re Banks*, 457 B.R. 9 (No. 11-6025) (stating that the claimant is the owner of both the note and the mortgage). Not surprisingly, the parties barely mentioned *Jackson* in their briefs. Clearly, then, the question whether a mortgagee must possess the underlying note in order to have a valid interest in the mortgage was not before the court in *Banks*; had it been, it is inconceivable that the parties would have basically ignored *Jackson*.

The Bankruptcy Appellate Panel summarily rejected the debtors' main argument regarding the mortgage's chain of title, but reversed because there was an issue of fact concerning whether the claimant had possession of the original promissory note. *In re Banks*, 457 B.R. at 11-12 & n.6. The court observed that, because the note was endorsed in blank, actual possession was required to enforce or negotiate the note. *Id.* at 12. It is not clear whether the court believed that the status of the note affected the claimant's status as a secured creditor; given that the debtors did not make such an argument, it is likely that the court was addressing only the

-14-

claimant's ability to *collect on the note* (and not the claimant's ability to *foreclose on the mortgage*).[4]  *See id.* (discussing the claimant's ability to "enforce the note").  In any event, to the extent that *Banks* meant to imply that, as a matter of Minnesota law, it is necessary to own the underlying note in order to have valid legal title to a mortgage, *Banks* was clearly wrong and was clearly superseded by the Eighth Circuit's later decision in *Stein*.[5]

## C.  Remaining Claims

Most of plaintiffs' claims in this case are based on the show-me-the-note theory.  For the reasons described above, those claims are frivolous.  That includes plaintiffs' quiet-title claims, on which they have placed great emphasis.[6]  Plaintiffs have unearthed old case law indicating

---

[4]It is also possible that the court saw ownership of the note as significant, not as a matter of Minnesota law, but as a matter of federal bankruptcy law.  One of the issues apparently being contested in *Banks* was the claimant's attempt to obtain relief from the automatic stay pursuant to 11 U.S.C. § 362(d) and Bankr. D. Minn. R. 4001-1(b).  *See In re Banks*, 457 B.R. at 12 (referring to the claimant's "pending motion for relief" and noting that "production of the note will most likely remove the final hurdle" to that motion); Brief of Plaintiffs-Appellants at 20, *In re Banks*, 457 B.R. 9 (No. 11-6025) (discussing the standards necessary to obtain relief from stay under § 362(d) and Rule 4001-1(b)).  To demonstrate standing to seek such relief, Rule 4001-1(b) requires the movant to produce, among other things, a copy of the note and the mortgage.  Although this Court is not in a position to offer an informed opinion on the matter, it is not inconceivable that, as a matter of bankruptcy law, a claimant may have to show more than legal and record title to the mortgage to obtain relief from stay even though, as a matter of Minnesota law, no more than that is required to foreclose on a property.

[5]The Court also notes that, although the Eighth Circuit does not appear to have addressed the question whether Bankruptcy Appellate Panel decisions are binding, *see In re Farmland Industries, Inc.*, 397 F.3d 647, 653 (8th Cir. 2005) (noting "the unsettled question whether BAP decisions are binding precedent"), other courts have held that the decisions of a bankruptcy appellate panel are not binding on district courts, *see Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir. 1990).  The Court agrees with those decisions.

[6]It appears that, technically speaking, it would be more accurate to call these claims "claims to determine adverse claims" rather than "quiet-title claims."  *See Walczak v. Keel*, No. A04-1391, 2005 WL 288781, at *1 n.1 (Minn. Ct. App. Feb. 8, 2005).

that, to state a quiet-title claim, a plaintiff need only allege that he is in possession of the property and that the defendant asserts an adverse interest in the property.  *See Steele v. Fish*, 2 Minn. 153, 154-55 (1858) ("The only facts necessary to constitute a cause of action under this statute are, the actual possession of the land by the plaintiff, in person or by tenant, and some claim by the defendants adverse to him, of an estate or interest in the land.").  In their briefs, plaintiffs imply that, under Minnesota law, a plaintiff can file a quiet-title action even if she has no reason whatsoever to challenge the validity of the defendant's asserted interest in her property.  But plaintiffs conceded at oral argument that, under Fed. R. Civ. P. 11, a quiet-title claim must be supported by an objectively reasonable basis for believing that the defendant's asserted interest in the property is invalid.  Hr'g Tr. 47-48.  Plaintiffs have no such basis in this case.  Without an objectively reasonable basis for asserting that defendants' mortgages are invalid, plaintiffs' quiet-title claims are just as frivolous as any other claim that is premised on the show-me-the-note theory.

The real challenge in this case has been to determine whether, among plaintiffs' dozens of claims, there are any that are *not* premised on the show-me-the-note theory.  The Court has been concerned that it might overlook a viable claim because the claim was buried in this heap of frivolous claims.  Reflecting that concern, the Court held a four-hour hearing during which it closely questioned Butler about what claims would survive in the inevitable event that the Court rejected his show-me-the-note theory.

Pinning down Butler was not an easy task.  No matter what the line of questioning pursued by the Court, Butler generally ended up finding new ways to repackage his show-me-the-note argument.  For example, Butler argued at one point that, although *Jackson* and *Stein* may

stand for the proposition that a mortgagee may *commence* foreclosure proceedings without holding the note, those cases do not permit the mortgagee to show up at the foreclosure sale and *bid in the debt* unless it holds the note.  Butler based this argument on language in *Jackson* and other cases discussing the requirements necessary to "commence" foreclosure.  *Jackson*, 770 N.W.2d at 501 ("only assignments of legal title of the security instrument must be recorded in order to commence a foreclosure by advertisement"); *Stein*, 662 F.3d at 980 ("Chase was the party entitled to commence a foreclosure by advertisement under Minnesota law, even if the promissory note (and the corresponding equitable interest in the mortgage) had been transferred to someone else").

With this argument, Butler unwittingly provides an example of two unfortunate tendencies of his.  The first is Butler's complete lack of concern for logical coherence or consistency.  Butler's made-up-on-the-spot claim that a mortgagee with bare legal title *can* commence foreclosure proceedings but cannot bid in the debt at the sale appears nowhere in his pleadings and nowhere in any of the multiple briefs that he submitted in opposition to defendants' motions.  To the contrary:  Butler's willingness to concede at the hearing that a mortgagee with bare legal title can at least *commence* foreclosure is completely inconsistent with much of what he alleges in the amended complaint and much of what he argues in his briefs. *See, e.g.*, ECF No. 59 at 12 (arguing that there is a factual issue concerning whether Deutsche held the note when it commenced foreclosure of the Albers property); Am. Compl. ¶ 132 (alleging that recording foreclosure notices is a false representation that the mortgagee has the right to foreclose); Am. Compl. ¶ 40 (alleging that defendants cannot exercise foreclosure rights in the mortgages because they do not hold the notes).

The second tendency is shared by many litigants: the propensity to treat a judicial opinion as though it were a statute or regulation whose every word is "law" that must be given precise effect.  No one could read *Jackson* and *Stein* and reasonably conclude that they meant to limit their holdings to the commencement of foreclosure proceedings.  *Jackson* focused on the commencement of foreclosure proceedings simply because that is the point in time at which it is necessary to ask whether the prerequisites to foreclosure by advertisement have been met — which was the main issue in *Jackson*.  770 N.W.2d at 489.  But *Jackson* also explicitly held that any disputes between the mortgagee and the note holder do not affect the validity of the foreclosure as against the mortgagor.  *Id.* at 501 ("any disputes that arise between the mortgagee holding legal title and the assignee of the promissory note holding equitable title do not affect the status of the mortgagor for purposes of foreclosure by advertisement").  This holding disposes of Butler's argument  (or would dispose of it, if it were properly before this Court) that a mortgagee cannot bid in the debt unless it holds the note or is acting as the agent of the note holder.  *See also Bottineau v. Aetna Life Ins. Co.*, 16 N.W. 849, 850 (Minn. 1883) ("The mortgagor, whose interests were not affected by the fact that others had equitable rights in the mortgage with the one in whom the legal title was vested, could not on that fact alone object to his using such legal title."); *Kebasso v. BAC Home Loans Servicing, LP*, 813 F. Supp. 2d 1104, 1113 (D. Minn. 2011) (explaining that disputes between the note holder and the mortgagee do not give the mortgagor standing to challenge the mortgagee's right to foreclose); *Deutsche Bank Trust Co. Americas v. Souza*, No. A10-190, 2010 WL 3958671, at *3 n.2 (Minn. Ct. App. Oct. 12, 2010) ("Any dispute that may occur between the owners of those legal and equitable mortgagee's rights regarding who is entitled to the collateral involves the holders of those mortgagee's rights, not

the mortgagor.  Since Souza is the mortgagor and does not hold a mortgagee's interests in his mortgage, he lacks standing to make an argument based on the distinction.").

While Butler was making up new arguments at the hearing, he also came up with the notion that a mortgage must be "perfected" in order to be valid.  True, Butler did vaguely allude to the concept of "perfection" in the amended complaint and in his briefing.  *See, e.g.*, Am. Compl. ¶ 96(a) ("The mortgages are not properly perfected.").  But Butler gave no hint as to what he meant by this concept, and defendants reasonably understood it to mean that Butler was alleging that the mortgages had not been *recorded*.  *See Landmark v. Schaefbauer*, 41 B.R. 766, 770 (Bankr. D. Minn. 1984) (interpreting the phrase "to . . . perfect . . . any lien" in 11 U.S.C. § 362(a)(4) to include the recording of a real-estate mortgage).  In response, defendants pointed out that all of the mortgages and assignments of the mortgages with respect to each plaintiff's property were indeed properly recorded.

At oral argument, however, Butler surprised the Court and defendants with a novel theory of what it means to "perfect" a mortgage:  According to Butler, a mortgage is not "perfected" unless the ownership of the note and mortgage coincide at certain critical moments — in particular, when the mortgage is first created and at the time of the foreclosure sale.  Hr'g Tr. 14-17.  This is nothing more than a restatement of Butler's frivolous argument that the mortgagee must hold the note for the mortgage and any foreclosure to be valid.

Finally, Butler argued that *Jackson* is now irrelevant because MERS adopted a change to its internal rules that, as Butler put it, "abandoned the proposition that a third-party nominee can foreclose in the name of someone without having possession of the note."  Hr'g Tr. 27.  Butler is referring to the fact that MERS has decided that rather than initiate foreclosure actions itself, it

will instead transfer legal title to the mortgage to the note holder, record that transfer, and let the

note holder pursue foreclosure.  No doubt MERS's change in policy was motivated by the fact

that it no longer wants to spend money defending hundreds of frivolous show-me-the-note

lawsuits.  But as to Butler's argument:  First, Butler's argument appears nowhere in his pleadings

or briefs; he just made it up at the hearing, and it is not properly before the Court.  Second,

MERS's policy change is irrelevant; whether or not MERS or any other mortgagee with bare

legal title chooses to *exercise* its right to foreclose obviously has nothing to do with whether that

mortgagee *has* such a right under Minnesota law.

In addition to finding new ways to repackage his show-me-the-note argument, Butler also

contended at the hearing that, whatever may be permitted as a general matter under the law of

Minnesota, the particular notes and mortgages at issue in this case *themselves* reserve to the note

holder both the power of sale and the power to accelerate the loan.  At least with respect to the

power of sale, however, Butler was misrepresenting the facts.  The mortgages that were granted

to MERS expressly convey both the mortgage interest and the power of sale to MERS and to

MERS's successors and assigns.  *See* Bank Defs.' App. at 37, ECF No. 44 (Welk mortgage); *id.*

at 150 (Bigelow mortgage); *id.* at 175-76 (Singramdoo mortgage); *id.* at 205-06 (Forte

mortgage); *id.* at 236 (Roster mortgage); *id.* at 253 (Klingner mortgage); *id.* at 332 (Miklas

mortgage); Kemper Decl. Ex. 1 at 3-4, ECF No. 54 (Rucci mortgage); Kanski Decl. Ex. 2 at 3

(Albers mortgage); *id.* Ex. 7 at 3-4 (Tibke mortgage); Vander Pol Decl. Ex. G at 1-2, ECF No. 41

(Patterson mortgage).[7]  Likewise, the mortgages that were granted directly to the lenders

---

[7]The Patterson mortgage expressly gives MERS the power to "foreclose and sell the
Property" and also expressly contemplates that MERS's interests may be assigned.  Unlike the
(continued...)

expressly convey both the mortgage interest and the power of sale to the lenders and to the lenders' successors and assigns.  *See* Bank Defs.' App. at 75 (Jones mortgage); Vander Pol Decl. Ex. B at 3 (Heinzman mortgage); *id.* Ex. L at 2 (Konobeck mortgage).  Because the record establishes a clear chain of title connecting the current mortgagees to the original owners of the mortgages, the current mortgagees may exercise these grants of power.

As for Butler's argument that the notes reserve the power to accelerate solely to the note holder:  Whether or not that is true — and the Court cannot say whether or not that is true, as not all of plaintiffs' notes are in the record — it has nothing to do with plaintiffs' claims in this case. Nowhere in their amended complaint — and nowhere in their briefs — do plaintiffs allege that their loans were improperly accelerated.  The only reference to the notices of default in the amended complaint is plaintiffs' vague allegation that Shapiro was defendants' agent "for purposes of enforcing falsely declared defaults on Plaintiffs' Original Notes and/or wrongfully foreclosing . . . ."  Am. Compl. ¶ 25.  But plaintiffs do not allege that they are not in default; to the contrary, at the hearing they conceded that they *are* in default.  And plaintiffs do not allege that there was anything improper about the notices of default.  Butler's arguments about acceleration and default notices are simply irrelevant.

Notwithstanding Butler's evasive and often absurd arguments, the Court was able with considerable effort to identify which claims are (or may be) independent of plaintiffs' show-me-

---

[7](...continued)
other mortgages, however, the Patterson mortgage does not expressly grant the power of sale to MERS's successors and assigns.  But contractual rights are generally assignable, and an assignment "provides the assignee with the same legal rights as the assignor had before assignment."  *Mountain Peaks Fin. Servs., Inc. v. Roth-Steffen*, 778 N.W.2d 380, 385 (Minn. Ct. App. 2010) (citation and quotations omitted).

the-note argument.  These include: (1) conversion/unjust enrichment (Counts V and VI); (2) slander of title and misrepresentation (Counts IV, IX, X, and XIV); and (3) accounting (Count XIII).[8]  The Court considers each set of claims in turn.

### 1.  Conversion/Unjust Enrichment (Counts V and VI)

In their conversion claim, plaintiffs generally allege that "Defendants accepted monthly mortgage payments from the Plaintiffs and wrongfully retained those payments thereby depriving Plaintiffs of their property."  Am. Compl. ¶ 112.  Similarly, in their unjust-enrichment claim, plaintiffs allege that they "conferred a financial benefit on the Defendants in the form of payments made to Defendants with the understanding that Defendants held legal title to and were holders in due course of Plaintiffs' Original Notes."  Am. Compl. ¶ 116.

This is not a show-me-the-note claim.  A plaintiff bringing a show-me-the-note claim argues that someone who does not hold the note cannot foreclose on the mortgage securing the note.  Here, however, plaintiffs argue that someone who did not hold the note solicited and collected payments on the note.  If a defendant did not hold the note but nevertheless accepted payments that were owed to the note holder (without the note holder's permission), then that defendant might indeed be found liable.  (Of course, the plaintiff would win little more than a moral victory, as he or she would owe the money recovered from the defendant to the true note holder.)

---

[8]The Court notes one further type of allegation that may also, on its face, seem to be independent of the show-me-the-note argument: that certain documents were not executed by authorized individuals.  At oral argument, however, Butler clarified that these allegations are based on the fact that these individuals (or the entities they represent) did not hold the notes and were not acting on behalf of the note holders.  Hr'g Tr. 49-50.  In other words, these allegations are yet another repackaging of the show-me-the-note claim.

The conversion claim is pleaded by every plaintiff against every defendant; the unjust-enrichment claim is pleaded by every plaintiff against every defendant except Shapiro.  This is plainly improper under Fed. R. Civ. P. 8.  At oral argument, plaintiffs admitted that they are not claiming that every defendant wrongfully retained monthly mortgage payments from every plaintiff.  Hr'g Tr. 88-89.  Yet that is exactly what the amended complaint alleges, and it is not possible for any particular defendant to know which plaintiffs are alleging that it wrongfully retained their mortgage payments.  When asked at the hearing to identify which defendants wrongfully retained mortgage payments from which plaintiffs, Butler was able to cite only a single example:  He claimed that defendant GMAC Mortgage, LLC ("GMAC") wrongfully accepted payments from plaintiff Susie Jones.  Hr'g Tr. 89, 91.

Given that plaintiffs have already had two opportunities to plead these claims and have not moved to amend their complaint, the Court will dismiss all of the conversion and unjust-enrichment claims with prejudice, with one exception:  Because Jones (belatedly) articulated a possible basis for conversion and unjust-enrichment liability against GMAC, the Court will dismiss Jones's conversion and unjust-enrichment claims against GMAC without prejudice.

2.  Slander of Title and Misrepresentation (Counts IV, IX, X, and XIV)

In sorting through plaintiffs' allegations of slander and misrepresentation, it is crucial to understand that most of those allegations are just camouflaged show-me-the-note claims. Plaintiffs start with the assumption that the show-me-the-note theory is valid and that everyone in the world agrees with it, and then equate any action taken to foreclose — or any representation that an entity has the right to foreclose — as the equivalent of a representation that the entity holds the underlying note.  *See, e.g.*, Am. Compl. ¶ 132 (alleging that MERS falsely represented

that it owned Welk's note by recording assignments of mortgages, notices of pendency of foreclosure, and foreclosure sale notices).  The bulk of plaintiffs' misrepresentation and slander-of-title allegations are based on this false equivalence, and thus the bulk of plaintiffs' misrepresentation and slander-of-title claims are frivolous.

Setting aside those "misrepresentations," the Court has identified three possible types of misrepresentations that are not premised on acceptance of the show-me-the-note theory.  First, plaintiffs allege that defendants falsely represented that there were amounts due on their *mortgages*, when, in fact, those amounts were due on their *notes*.  *See, e.g.*, Am. Compl. ¶¶ 52-53.  Second, plaintiffs allege that, with respect to certain plaintiffs, defendants recorded mortgage assignments that purported to assign rights in the notes even though the assignors did not hold the notes.  Am. Compl. ¶ 56 (Jones); *id.* ¶ 62 (Heinzman); *id.* ¶ 66 (Singramdoo); *id.* ¶ 80 (Patterson); *id.* ¶ 88 (Tibke).[9]  Finally, although this was not clear until oral argument, plaintiffs regard the act of showing up at a foreclosure sale to bid in the debt to be a de facto (and false) representation that the bidder either holds the note or is acting as an agent of the note holder.

The first set of allegations is based on the wording of certain recorded documents that purport to recite the original principal amounts of the "mortgages" and the amounts "due on" the "mortgages."  Plaintiffs do not claim that the amounts are incorrect; instead, they argue that the

---

[9]The Court notes that plaintiffs' allegations with respect to the Jones and Heinzman assignments appear meritless.  To begin with, both the Jones and Heinzman mortgages were granted to the original lenders.  Bank Defs.' App. at 74 (Jones mortgage); Vander Pol Decl. Ex. A, B (Heinzman note and mortgage).  Thus, Ameriquest Mortgage Company (in the case of Jones) and Bankers Mortgage Company, LLC (in the case of Heinzman) had the power to assign both the notes and the mortgages.  Moreover, the assignment of Jones's mortgage from Ameriquest to GMAC does not say anything about assigning the note.  *Compare* Am. Compl. ¶ 56 *with* Roy Decl. Ex. 1, ECF No. 81.

amounts are due only on their *notes*, not on their *mortgages*.  *See* Hr'g Tr. 62 ("There's no

principal amount due on any mortgage from the beginning of time to today.").

Plaintiffs are correct that it would be more accurate to say that the amounts are due on

notes that are secured by the mortgages rather than due on the mortgages themselves, but the

word "mortgage" is commonly used to refer to what is really a note secured by a mortgage.  This

is true in casual conversation; people often refer to how much they owe on their "mortgage" or to

the amount of their monthly "mortgage payment."  This is also true in the law.  For example,

Minnesota Statutes Chapter 580, which governs foreclosure by advertisement, often uses the

word "mortgage" as synonymous with the term "loan secured by a mortgage," such as when the

statute refers to the amount "due on" the "mortgage."[10]  Indeed, despite his contention that such

usage is confined to "sloppy thinkers" (a universe that apparently includes countless legislators,

judges, and members of the public), Hr'g Tr. 63, Butler himself uses the phrase "mortgage

payments" in the amended complaint.  Am. Compl. ¶¶ 112, 121.

Given the fact that Minnesota statutes themselves refer to amounts "due on" a

"mortgage," the Court does not believe that such references in documents prepared and recorded

by defendants can be characterized as false or misleading.  The Court acknowledges that, in

---

[10]*See* Minn. Stat. § 580.022 (required form of notice referring to "mortgage payments");
Minn. Stat. § 580.032, subd. 6 (referring to the "amount due on and secured by the lien"); Minn.
Stat. § 580.04(a)(3) (requiring each notice of foreclosure to specify "the amount claimed to be
due on the mortgage"); Minn. Stat. § 580.08 (referring to "the amount due on such mortgage");
Minn. Stat. § 580.09 (referring to installments "due upon the mortgage," the "amount remaining
unpaid on the mortgage," and "the remaining amount still unpaid on and secured by the
mortgage"); Minn. Stat. § 580.10 (referring to surplus money that remains "after satisfying the
mortgage"); Minn. Stat. § 580.13 (referring to the "mortgage debt"); Minn. Stat. § 580.225
(same); Minn. Stat. § 580.23, subd. 1 (same); Minn. Stat. § 580.28 (referring to actions alleging
that "any mortgage . . . has been paid"); Minn. Stat. § 580.30, subd. 1 (referring to paying to the
mortgage holder "the amount actually due *thereon*" (emphasis added)).

*Jackson*, the Minnesota Supreme Court rejected the argument that these statutory references are proof that the term "mortgage" is synonymous with "note" and that therefore assignments of the note must be recorded. *Jackson*, 770 N.W.2d at 495-96.  The question in this case, though, is not the proper interpretation of statutory language; it is whether use of the term "mortgage" as a shorthand reference to a note secured by a mortgage amounts to a fraudulent misrepresentation. No reasonable jury could find that it does.

Even if the Court is wrong — and even if references to amounts due on mortgages could be characterized as false representations concerning the identity of the note holders — plaintiffs admitted at oral argument that they are not aware of any payments that any of them made in reliance on these allegedly false representations.[11]  Hr'g Tr. 79-85.  Without reliance or damages, plaintiffs' misrepresentation and slander-of-title claims obviously must fail.  *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011) (common-law fraud requires proof of reliance and damages); *City of Maple Grove v. Marketline Constr. Capital, LLC*, 802 N.W.2d 809, 817 (Minn. Ct. App. 2011) ("A crucial element of fraud, negligent misrepresentation, and promissory estoppel claims is reliance."); *Paidar v. Hughes*, 615 N.W.2d 276, 279-80 (Minn. 2000) (slander of title requires showing of pecuniary loss in the form of special damages).[12]

---

[11]As discussed earlier, plaintiffs represented at oral argument that Jones erroneously made monthly mortgage payments to GMAC, who wrongfully retained them.  But plaintiffs did not connect Jones's alleged payments to any fraudulent or negligent misrepresentation.

[12]In *Paidar*, the Minnesota Supreme Court held that "special damages" can include the attorney's fees incurred in an action to remove the cloud on title.  *Paidar*, 615 N.W.2d at 281.  In this case, though, plaintiffs' quiet-title claims are entirely dependent on the frivolous show-me-the-note argument.  *See* Am. Compl. ¶¶ 93-96.  Moreover, it is not clear to the Court that a false representation about the ownership of the note could constitute slander of title, as the note by itself is not an interest in land.  *See Paidar*, 615 N.W.2d at 279 (slander-of-title claim requires
(continued...)

Plaintiffs remaining misrepresentation claims fail for the same reason.  Again, plaintiffs bring misrepresentation claims based on the fact that some defendants allegedly recorded mortgage assignments that purported to assign rights in the *notes* even though the defendants did not hold the notes, and on the fact that some defendants showed up at foreclosure sales and bid in the debt (which, in plaintiffs' view, was an implicit representation that the defendant held the note or was acting as an agent of the note holder).  Putting aside other problems with these claims, plaintiffs were unable to identify any way in which they relied on any of these alleged misrepresentations, and thus their claims must fail.

### 3.  Accounting (Count XIII)

Finally, plaintiffs bring a claim labeled "accounting."  In their briefing, plaintiffs conclusorily argue that "the defendants have violated federal law by refusing to respond to Plaintiffs' requests for information regarding the ownership of their loans."  ECF No. 58 at 20. There are several problems with this argument:

First, the accounting claim that plaintiffs actually pleaded says nothing like this.  Instead, it says that plaintiffs "demand an accounting to determine the amount of debt owed, if any, to the [Pooling and Servicing Agreement] and Certificate Holders."  Am. Compl. ¶ 170.

Second, plaintiffs do not identify the federal law that they claim was violated.  No doubt this is because plaintiffs do not actually mean to invoke federal law.  As described above, Butler strives mightily to keep his cases out of federal court.  To rely on federal law would substantially undermine his motions to remand.  Although plaintiffs' brief strongly suggests that they are

_____

[12](...continued)
false statement concerning the plaintiff's real property).

trying to dress a RESPA claim in state-law clothing, Butler disclaimed any reliance on federal law at the hearing — even though, as noted, he explicitly relied on federal law in his brief.  Hr'g Tr. 107-08.

Third, it is not clear to the Court that plaintiffs can demand information about the ownership of their notes through the vehicle of an accounting claim.  As the name suggests, the right to an accounting is the right to have the defendant account for funds or other property.  *See Physicians & Hosps. Supply Co. v. Johnson*, 44 N.W.2d 224, 229 (Minn. 1950) ("Before the duty of a fiduciary to account arises, it is essential that complainant establish not only the confidential or fiduciary relationship between the parties, but also the receipt by the fiduciary of the funds to be accounted for."); *Robert W. Nicholson, Jr. Trust v. Sawmill Golf Club, Inc.*, No. A05-2283, 2006 WL 3593032, at *3 (Minn. Ct. App. Dec. 12, 2006) (the "equitable remedy known as an accounting . . . compels the disclosure of money or property held or obtained by a particular party but which belongs to another").  Plaintiffs cite no authority in support of their accounting claim, much less any authority suggesting that a claim for accounting can be used to demand other kinds of information from a defendant.

Given that plaintiffs have (1) failed to defend the accounting claim that they pleaded and (2) disclaimed the accounting claim that they briefed, the Court grants defendants' motions to dismiss this claim.

In sum, the Court concludes that all of plaintiffs' claims should be dismissed with prejudice, with the sole exception of Jones's claims for conversion and unjust enrichment against GMAC.  Those claims of Jones should be dismissed without prejudice.

## II.  MOTIONS TO REMAND

Of course, the Court cannot actually dismiss plaintiffs' claims on the merits without determining whether it has jurisdiction.  Plaintiffs have filed two motions to remand.  The first, filed before the hearing, argues that the Court does not have jurisdiction because complete diversity of citizenship is lacking.  The second, filed after the hearing and after Butler was ordered to show cause why he should not be sanctioned, argues that the doctrine of prior exclusive jurisdiction applies.  The Court considers each motion in turn.

### A.  Diversity

All of the plaintiffs are citizens of Minnesota.  None of the defendants — with the sole exception of Shapiro — is a citizen of Minnesota.  As noted earlier, Shapiro is a law firm that conducted foreclosures on 6 of the 14 properties at issue in this case.  Because Shapiro is a citizen of Minnesota, complete diversity of citizenship is lacking.  *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806) (adopting the complete-diversity rule).

Defendants contend that the Court can disregard the claims against Shapiro under the doctrine of fraudulent joinder.  *See Simpson v. Thomure*, 484 F.3d 1081, 1083 (8th Cir. 2007) (the right of an out-of-state defendant to remove a diversity suit to federal court cannot be defeated by the fraudulent joinder of a resident defendant).  The Court does not doubt that Butler joined Shapiro as a defendant solely to block removal of the case to federal court.  And, as discussed above, the Court has concluded that all of plaintiffs' claims (with the exception of Jones's conversion and unjust-enrichment claims against GMAC) should be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6).

-29-

To establish fraudulent joinder, however, a defendant must go beyond demonstrating that the claims against the nondiverse defendant should be dismissed under Rule 12(b)(6). *Block v. Toyota Motor Corp.*, 665 F.3d 944, 948 (8th Cir. 2011). Instead, the defendant must show that "'there exists no reasonable basis in fact and law supporting a claim against [that] defendant[].'" *Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002, 1004 (8th Cir. 2006) (quoting *Filla v. Norfolk S. Ry.*, 336 F.3d 806, 810 (8th Cir. 2003)). The joinder of a nondiverse defendant is not fraudulent where "'there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved.'" *Block*, 665 F.3d at 948 (quoting *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 446 (8th Cir. 2010)). In appropriate cases, courts may take a limited look at evidence outside the pleadings in making this inquiry. *See Masepohl v. Am. Tobacco Co.*, 974 F. Supp. 1245, 1250 (D. Minn. 1997); *see also Block*, 665 F.3d at 948 ("In fraudulent joinder cases, some courts examine material beyond the complaint's allegations to 'determine if there is any factual support' for the claims against the allegedly fraudulently joined defendant." (quoting *Masepohl*)).

This stricter standard poses no barrier to the Court's exercise of jurisdiction in this case. Most of plaintiffs' claims are based on the show-me-the-note theory, which, as explained above, is completely frivolous. It follows, then, that "there exists no reasonable basis in fact and law" for plaintiffs to assert any claim premised on the show-me-the-note theory against Shapiro.

The claims against Shapiro that do *not* depend on the show-me-the-note theory are also frivolous. As explained above, plaintiffs admitted that they have no basis for alleging damages as a result of any misrepresentation or slander of title. Plaintiffs likewise could not identify a

single dollar that was converted by any defendant, with the possible exception of Jones's
payments to GMAC.

Even if those payments give Jones a claim against GMAC, however, they do not provide
a basis for a claim by Jones against Shapiro. Nobody contends that *Shapiro* ever handled Jones's
mortgage payments, and Jones and all of the other plaintiffs admitted that they did not know
whether any of them had ever made a mortgage payment to the wrong entity on the basis of any
fraudulent misrepresentation made to them by Shapiro or anyone else. Hr'g Tr. 79-85. Without
any allegation that Shapiro handled Jones's mortgage payments or that Jones relied on a
misrepresentation by Shapiro to make payments to the wrong entity, the Court cannot understand
how Shapiro could possibly be liable to Jones for the improper mortgage payments to GMAC.
The bare, conclusory allegation that Shapiro acted as an agent in some unspecified way
"regarding" the Jones property, Am. Compl. ¶ 113, provides no reasonable factual or legal basis
to connect Shapiro to Jones's mortgage payments. The Court therefore concludes that Shapiro
was fraudulently joined and denies plaintiffs' motion to remand for lack of diversity jurisdiction.

### B. *Prior Exclusive Jurisdiction*

After the hearing, and after he was ordered to show cause why he should not be
sanctioned, Butler filed a second motion to remand, arguing that the doctrine of prior exclusive
jurisdiction precludes the Court from exercising jurisdiction over plaintiffs and their properties.
In filing the motion without securing a hearing date, Butler violated D. Minn. LR 7.1.
Nevertheless, because the motion challenges the Court's subject-matter jurisdiction, the Court
will address it on the merits.

Under the doctrine of prior exclusive jurisdiction, "when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Marshall v. Marshall*, 547 U.S. 293, 311 (2006).  Plaintiffs contend that, because this action is in rem, the state court in which it was filed acquired in rem jurisdiction before defendants removed the action to federal court, and therefore this Court lacks jurisdiction.  If plaintiffs were correct, then all of the hundreds of mortgage cases now pending in federal courts that were removed from state courts would have to be remanded.  That would help to ease the workload of the federal courts, but unfortunately for the federal courts, plaintiffs' argument is almost entirely without merit.

The doctrine of prior exclusive jurisdiction applies in only two circumstances.  First, and most commonly, the doctrine applies when there are multiple proceedings through which different courts are attempting to assert jurisdiction over the same property *at the same time.  See United States v. Bank of N.Y. & Trust Co.*, 296 U.S. 463, 480-81 (1936) (first-filed state cases took precedence over later-filed federal cases); *Penn Gen. Cas. Co. v. Penn. ex rel. Schnader*, 294 U.S. 189, 197 (1935) (federal court had jurisdiction over first-filed federal suit, although it had the discretion to abstain in light of the ongoing state liquidation proceedings involving the state insurance commissioner); *Palmer v. Texas*, 212 U.S. 118, 123, 132 (1909) (first-filed state case took precedence over later-filed federal case); *Farmers' Loan & Trust Co. v. Lake St. Elevated R.R.*, 177 U.S. 51, 61-62 (1900) (first-filed federal case took precedence over later-filed state case); *Chapman v. Deutsche Bank Nat'l Trust Co.*, 651 F.3d 1039, 1041 (9th Cir. 2011) (per curiam) (certifying question to state court to determine whether concurrent cases — a quiet-title

action that was removed to federal court and an unlawful-detainer action that was pending in state court — were both in rem actions).

Second, and less commonly, the doctrine applies when a court has acquired some form of specialized, continuing jurisdiction over the property. That continuing jurisdiction, even in the absence of a pending case, precludes other courts from exercising jurisdiction over the same property in later cases. *See State Eng'r v. S. Fork Band of the Te-Moak Tribe*, 339 F.3d 804, 810-11 (9th Cir. 2003) (federal court lacked jurisdiction where water rights were under state court's continuing jurisdiction pursuant to a 70-year-old decree); *In re Trust Created by Hill*, 728 F. Supp. 564, 567-68 (D. Minn. 1990) (federal court lacked jurisdiction where state court's continuing jurisdiction and supervisory responsibility over trust had attached decades earlier).

With one possible exception (discussed below), neither of these circumstances is present in this case. This case involves a single proceeding — a proceeding that was started in state court and then removed to federal court. When the case was removed, the state court was entirely divested of jurisdiction. *In re Trust Created by Hill*, 728 F. Supp. at 567 (where "the state court's jurisdiction over the property in question was based solely on its jurisdiction over a particular action," removal was appropriate because it "eliminated the state court's jurisdiction over the property and did not pose any conflict between the courts"); *see also* 28 U.S.C. § 1446(d) (once removal is effected, the state court is prohibited from proceeding any further unless and until the case is remanded). Because the state court in which this case originated no longer has jurisdiction over it, this Court's exercise of jurisdiction does not conflict with the exercise of jurisdiction by any state court.

Plaintiffs point to the fact that, in some cases in which federal courts have applied the doctrine of prior exclusive jurisdiction, the cases were removed from state to federal court. For this reason, plaintiffs insist, the doctrine "applies" in removed cases and requires remand to state court. But in the cases plaintiffs cite, the removal was an irrelevant part of the procedural history. The critical fact was that one of the two circumstances described above was present — that is, either (1) there were separate, multiple in rem proceedings or (2) there was continuing state-court in rem jurisdiction that had attached *before* the commencement of the case that was later removed to federal court. *See Chapman*, 651 F.3d at 1041; *State Engineer*, 339 F.3d at 807-08, 814; *In re Trust Created by Hill*, 728 F. Supp. at 567-68.

So to argue, as plaintiffs do, that the doctrine of prior exclusive jurisdiction applies in removed cases is true but beside the point; the doctrine of prior exclusive jurisdiction applies in *every* federal case. Under the doctrine, it makes no difference how a case regarding a piece of property got to federal court. The results in *State Engineer* and *In re Trust Created by Hill* would have been the same — and, assuming that the Nevada Supreme Court finds that the actions at issue in *Chapman* are in rem, the result in *Chapman* will be the same — even if the federal cases had been filed in federal court as an original matter. Indeed, if plaintiffs' argument were correct, then federal courts could *never* exercise in rem jurisdiction in cases removed from state court — a result contrary to well-established law and inconsistent with the results of countless cases over the past century. *See* 28 U.S.C. § 1450 (after removal, "any attachment or sequestration of the goods or estate of the defendant in such action in the State court shall hold the goods or estate to answer the final judgment or decree in the same manner as they would have been held to answer final judgment or decree had it been rendered by the State court"); *Rorick v. Devon Syndicate*,

307 U.S. 299, 312 (1939) ("where jurisdiction in rem has been acquired prior to removal, plaintiff may obtain in the federal court after removal such orders of attachment or garnishment as would have been available to him had he been permitted to remain in the state court"); *State of Mo. ex rel. St. Louis, B & M. Ry. Co. v. Taylor*, 266 U.S. 200, 209 (1924) (noting that, when an in rem action is removed, "it proceeds to judgment in the federal court and the judgment is enforced there as against the attached property with the same effect as if the cause had remained in the state court").

The relevant question, then, is not how a case about a piece of property ended up in federal court, but whether there are conflicting attempts to assert jurisdiction over that piece of property. In this case, there is no suggestion that any state court has acquired some form of specialized, continuing jurisdiction over any of plaintiffs' properties. Nor, in their initial memorandum, did plaintiffs identify any other proceedings involving their properties. Instead, plaintiffs' sole argument was that, because *this* case originated in state court, the Court cannot exercise in rem jurisdiction — an argument that, as discussed above, is frivolous.

In their reply, however, plaintiffs for the first time reveal that there are (or were) pending state-court unlawful-detainer actions involving the Welk, Singramdoo, and Klingner properties. *See Bank of New York Mellon Trust Co. v. Welk*, No. 62-HG-CV-11-2261 (Minn. Dist. Ct. filed Aug. 8, 2011); *Deutsche Bank Trust Co. Americas v. Singramdoo*, No. 19WS-CV-12-149 (Minn. Dist. Ct. filed Jan. 24, 2012); *U.S. Bank Nat'l Assoc. v. Klingner*, No. 30-CV-12-47 (Minn. Dist. Ct. filed Jan. 18, 2012). Plaintiffs do not identify when these actions were filed, but a perusal of the public state-court docket indicates that the *Singramdoo* and *Klingner* actions were filed in January 2012, well *after* jurisdiction had attached in this case. *See* ECF No. 1 (notice of removal

filed Sept. 16, 2011). The *Singramdoo* and *Klingner* actions therefore do not preclude this Court from exercising jurisdiction over Singramdoo's and Klinger's claims.

The *Welk* action, however, was filed in August 2011, before this case was removed. According to public records, *Welk* was administratively closed in October 2011, about a month after this case was removed. Needless to say, because of plaintiffs' failure to mention the *Welk* action in their initial memorandum — an inexcusable failure, given that Butler represented Welk in that action — the parties have not addressed the effect of the pendency and subsequent closure of the *Welk* action on this Court's jurisdiction over Welk's claims, nor have they addressed whether an unlawful-detainer action is in rem. Likewise, because plaintiffs' initial arguments in support of their second motion to remand were so obviously meritless, defendants did not see the need to address whether this proceeding is in rem. The Court is therefore left with inadequate briefing on the issue of whether it has jurisdiction over Welk's claims.

The Court will therefore stay its dismissal of Welk's claims while the parties brief the following matters: (1) whether this proceeding is in rem; (2) whether an unlawful-detainer action is in rem; (3) the current procedural status of the *Welk* unlawful-detainer action; and (4) whether the pendency of the *Welk* action at the time of removal precludes this Court's exercise of jurisdiction over Welk's claims even though the *Welk* action is no longer pending.

The parties should brief one additional issue: whether, pursuant to 28 U.S.C. § 1927, the Court should order Butler to pay the attorney's fees incurred by defendants in responding to the frivolous arguments that he made in his initial brief supporting his second motion to remand and in submitting the supplemental briefing that has become necessary because of Butler's failure to identify the *Welk* action until he filed his reply brief. Butler's serial filing of remand motions

raising different grounds — and his ambushing defendants with new arguments in his reply brief

— appear unreasonable and vexatious.

## III.  SANCTIONS

In conjunction with their motions to dismiss, defendants moved for sanctions under 28

U.S.C. § 1927.  After the hearing on defendants' motions to dismiss and plaintiffs' (first) motion

to remand, the Court sua sponte issued a short order pursuant to Fed. R. Civ. P. 11(c) requiring

Butler to show cause why he should not be sanctioned for

> bringing claims premised on, and later advocating, a contention
> that has been explicitly rejected by the Minnesota Supreme Court
> in *Jackson v. Mortgage Electronic Registration Systems, Inc.*, 770
> N.W.2d 487 (Minn. 2009), and by the United States Court of
> Appeals for the Eighth Circuit in *Stein v. Chase Home Finance,
> LLC*, 662 F.3d 976 (8th Cir. 2011) — namely, that a mortgage is
> not valid and a mortgagee cannot exercise the right of foreclosure
> under it unless the mortgagee also holds the associated promissory
> note.

ECF No. 91.

This order — and defendants' motion for sanctions — were prompted by more than just

Butler's conduct in this case.  As noted, Butler has made a cottage industry of filing frivolous

show-me-the-note claims.  As also noted, Butler has not only filed (at last count[13]) nearly

30 frivolous lawsuits, but he has engaged in brazen delay tactics and judge-shopping by

voluntarily dismissing actions only to turn around and refile them again immediately afterwards.

*Compare Emmick v. Bank of Am., N.A.*, No. 11-1307 (DSD/SER) (voluntarily dismissed on

July 22, 2011) *with Kent v. Bank of Am., NA*, No. 11-2315 (JRT/LIB) (the same action, with one

---

[13]Defendants have recently informed the Court that Butler has continued to file new
show-me-the-note cases in recent weeks.  *See* ECF Nos. 115, 117.

new plaintiff, removed to federal court on Aug. 11, 2011); *compare Jaakola v. CitiMortgage, Inc.*, No. 11-1272 (DWF/TNL) (voluntarily dismissed on July 28, 2011) *and Lundeen v. CitiMortgage, Inc.*, No. 11-1604 (PAM/FLN) (voluntarily dismissed on July 30, 2011) *with Peterson v. CitiMortgage, Inc.*, No. 11-2385 (SRN/JJG) (case involving nearly all of the plaintiffs in *Jaakola* and *Lundeen* removed to federal court on Aug. 18, 2011); *compare Rother v. Wells Fargo Bank, N.A.*, No. 11-1703 (DWF/JSM) (voluntarily dismissed on Aug. 1, 2011) *with Pope v. Wells Fargo Bank, N.A.*, No. 11-2496 (SRN/FLN) (case involving nearly all of the plaintiffs in *Rother* removed to federal court on Aug. 31, 2011); *compare Joppru v. JP Morgan Chase Bank, N.A.*, No. 11-2276 (PJS/FLN) (voluntarily dismissed on Oct. 12, 2011) *with Jerde v. JP Morgan Chase Bank, N.A.*, No. 11-2666 (PAM/FLN) (amended complaint filed on Oct. 12, 2011 adding the plaintiffs from *Joppru*).

As defendants point out, when Butler engages in this conduct, he starts a three- or four-month (or sometimes five- or six-month) process all over again.  In the most egregious example, Butler voluntarily dismissed a case while an adverse Report and Recommendation was pending and then refiled the same case in state court the very same day.  *Compare Larsen v. Bank of Am., N.A.*, No. 11-1775 (MJD/JSM) (voluntarily dismissed on July 27, 2011) *with Robinson v. Bank of Am., N.A.*, No. 11-2284 (MJD/LIB) (same case brought in state court on July 27, 2011 and removed to federal court on Aug. 9, 2011).  To make matters worse, many of the plaintiffs in *Larsen* and *Robinson* were also plaintiffs in *Tully v. Bank of America, N.A.*, 10-4734 (DWF/TNL), which Judge Donovan Frank dismissed without prejudice, but not before denying plaintiffs' motion to remand.  Butler's creative solution to that problem was to substitute a different nondiverse defendant when he refiled the case as *Larsen*.

Butler also repeatedly cycles the same plaintiffs through different lawsuits, making sure to reshuffle the caption so that a different person appears to be the lead plaintiff. Often, Butler splits spouses between cases. For example, the lead plaintiff in this case, Heather Welk, is also a plaintiff in *Cartier v. Wells Fargo Bank, N.A.*, No. 11-2168 (JRT/AJB). Welk's husband, Dean Welk, is not a plaintiff in this action, but he is a plaintiff in *Cartier* as well as *Larsen v. Bank of America, N.A.*, No. 11-1775 (MJD/JSM), *Robinson v. Bank of America, N.A.*, No. 11-2284 (MJD/LIB), and *Brinkman v. Bank of America, N.A.*, No. 11-3240 (JRT/TNL). Similarly, one of the plaintiffs in this case is William Bigelow; there is a "William A. Bigelow" in *Kent v. Bank of America, NA*, No. 11-2315 (JRT/LIB) and a "Bill Bigelow" in *Emmick v. Bank of America, N.A.*, No. 11-1307 (DSD/SER).

To be sure, many of these plaintiffs own multiple properties, and as best as the Court can tell, Butler has not had separate actions involving the same property pending at the same time (although, given the number of cases, parties, and properties involved, it would be difficult to verify this, particularly because Butler will identify the same property using the address in one case and the legal description in another case). But even if Butler has never had multiple actions involving the same property pending at the same time, there is no legitimate reason for Butler to split a single plaintiff's claims in this manner when he so readily bundles together completely unrelated plaintiffs into the same case.

In short, Butler has been abusing, not using, the judicial system, and his conduct appears to violate multiple provisions of the Minnesota Rules of Professional Conduct. This Court will forward a copy of this order to the Minnesota Lawyers Professional Responsibility Board. Whether Butler should be disciplined for his overall conduct will be the decision of the Board

and ultimately the Minnesota Supreme Court.  But whether Butler should be sanctioned for his conduct in this particular case is the decision of this Court.

Rule 11(b) requires an attorney to certify to the court that his client's "claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law . . . ."  In determining whether this provision has been violated, a court "must determine whether a reasonable and competent attorney would believe in the merit of an argument."  *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir. 2003) (citation and quotations omitted).  In addition to certifying that his arguments have a sound legal basis, the attorney must also certify that his pleadings, written motions, and other papers are "not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation . . . ."  Fed. R. Civ. P. 11(b)(1). An attorney who violates these provisions may be sanctioned.  Fed. R. Civ. P. 11(c)(1).

As discussed at great length above, Butler's argument that a mortgage is not valid unless the mortgagee also owns the underlying note is frivolous under Minnesota law.  Indeed, because it is frivolous, Butler goes to great lengths to camouflage it.  In the end, though, drilling down through Butler's various arguments always leads to the same place: an argument that the mortgage is invalid because the mortgagee does not hold the note.

In response to the Court's order to show cause, Butler — through his attorney, Erick G. Kaardal of Mohrman & Kaardal, P.A. — makes a number of points that are either meritless or irrelevant (or both).  For example, he argues that three of his state-court cases have survived motions to dismiss; that Justice Page wrote a vigorous dissent in *Jackson*; that his clients are

justifiably concerned that they may be subject to double liability; and that the foreclosure process

in Minnesota might somehow violate his clients' federal and state constitutional rights.[14]

---

[14]Butler also recently notified the Court of two cases "that may have some import to [the Court's] deliberations regarding the pending Rule 11 motion . . . ." ECF No. 120. The two cases are *Ruiz v. 1st Fidelity Loan Servicing, LLC*, No. A11-1081, 2012 WL 762313 (Minn. Ct. App. Mar. 12, 2012), and *Gewecke v. U.S. Bank, N.A.*, No. 09-1890 (JRT/LIB), 2011 WL 4538088 (D. Minn. Sept. 29, 2011). The only "import" these cases have to the Court's consideration of sanctions is by way of contrast. Unlike this case, they are examples of legitimate attorneys bringing legitimate mortgage-related claims that are reasonably grounded in fact and law.

The plaintiffs in *Ruiz* and *Gewecke* did not argue that their mortgages were invalid, much less argue that they were invalid because the mortgagees did not hold the note. Instead, *Ruiz* and *Gewecke* involved garden-variety challenges to the validity of foreclosures by advertisement on the basis that the foreclosures did not strictly comply with the relevant statutory requirements. In particular, both the *Ruiz* and *Gewecke* plaintiffs alleged (among other things) that not all assignments of the mortgage had been properly recorded before foreclosure commenced. *Ruiz*, 2012 WL 762313, at *2-3; *Gewecke*, 2011 WL 4538088, at *1-2. That is not an issue in this case; plaintiffs here conceded (and the record establishes) that each foreclosing entity had record title to the mortgage, and plaintiffs have never raised any issue about the timing of recordation. More importantly, the plaintiffs in *Ruiz* and *Gewecke* were challenging the validity of the *foreclosures*. Plaintiffs here, by contrast, are challenging the validity of the *mortgage liens*. Hr'g Tr. 8, 10. And, unlike the plaintiffs in *Ruiz* and *Gewecke*, plaintiffs in this case have chosen to base their challenge on a theory that has been expressly rejected by the Minnesota Supreme Court.

True, in *Ruiz* the Minnesota Court of Appeals remanded for entry of judgment in the plaintiff's favor on her quiet-title claim. *Ruiz*, 2012 WL 762313, at *5. (The Court assumes that this is why Butler brought *Ruiz* to the Court's attention; he seems to regard the phrase "quiet title" as a talisman that, through a process of legal alchemy, transforms frivolous claims into meritorious ones.) But at the risk of being repetitive, the Court points out that the *Ruiz* plaintiff prevailed on her quiet-title claim because she successfully proved that the *foreclosure* was void; there is no discussion in *Ruiz* about any attempt to void the *mortgage* on which the foreclosure was based. To the contrary, the court's remand for further proceedings on the plaintiff's wrongful-eviction claim indicates that the mortgage remained valid. Were it otherwise, there would have been no legal basis for the defendant to evict the plaintiff from the upper unit of the property. *See id.* (noting that the holder of a mortgage has the right to secure unoccupied premises and remanding because the plaintiff had raised an issue of fact concerning whether the upper unit was occupied); *see also Bottineau*, 16 N.W. at 849-850 (rejecting the argument that a prior invalid foreclosure could prevent the mortgagee from a second attempt to exercise the power of sale).

As to the state-law cases:  The Court has already explained that two of the three state-court cases on which Butler so heavily relies actually *reject* his show-me-the-note theory, and the third says nothing about it.  The Court brought this to Butler's attention at oral argument, before Butler filed his response to the show-cause order.  Hr'g Tr. 23-26.  The Court is therefore puzzled to hear this argument repeated in the response.

As to Justice Page's dissent:  Justice Page's dissent in *Jackson* was, of course, a dissent.  The law of Minnesota was established by the majority opinion, not Justice Page's dissent.  And under that majority opinion, Butler's show-me-the-note argument is frivolous.

As to the claim that Butler's clients might be subject to full liability on the notes even after foreclosure:  This argument appears to be based on a misreading of Minnesota law.  Under Minn. Stat. § 580.225, the amount received from a foreclosure by advertisement is deemed to be "full satisfaction of the mortgage debt, except as provided in section 582.30."  Section 582.30, in turn, provides for a deficiency judgment in certain circumstances.  Butler tries to manufacture a problem by arguing that "mortgage debt" is somehow different from debt on the note — and by arguing that it is only "mortgage debt," and not debt on the note, that is satisfied by the foreclosure sale.  This is yet another example of Butler's lack of concern with logical coherence or consistency; as discussed above, he previously argued that defendants committed *fraud* when referring to amounts due on the mortgage because no amounts are *ever* due on a mortgage.  Yet Butler now argues that, on second thought, amounts *are* due on a mortgage — and that this "mortgage debt" is somehow different from the debt on the note that is secured by the mortgage.

In any event, Butler's argument about the "mortgage debt" is meritless.  The "mortgage debt" that is discharged by operation of § 580.225 is obviously the debt on the note that is

-42-

secured by the mortgage.  Even if a deficiency judgment is allowed, there can be no double

recovery:

> After payment of costs, sale proceeds in a foreclosure by action are
> applied against the debt secured by the mortgage.  Minn. Stat.
> §§ 580.09, 580.225 (1992).  In choosing between mortgage
> foreclosure and an action on the note, the mortgagee may pursue
> either or both remedies, as long as there is no double recovery on
> the debt.

*City of St. Paul v. St. Anthony Flats Ltd. P'ship*, 517 N.W.2d 58, 62 (Minn. Ct. App. 1994).[15]

Butler cites a number of cases from other jurisdictions that have mentioned the risk of

double liability as a reason to require the foreclosing entity to hold an interest in the note.  *See,*

*e.g.*, *Culhane v. Aurora Loan Servs. of Neb.*, No. 11-11098, 2011 WL 5925525, at *11 (D. Mass.

Nov. 28, 2011) ("Were a mortgagee without an interest in the debt able to exercise the power of

sale, the note would be left outstanding as a valid obligation of the mortgagor to its holder.").  As

just explained, the Court does not believe that this risk exists in Minnesota.  But whatever the

merits of Butler's arguments as an original matter, the fact remains that the Minnesota Supreme

Court has definitively held that a mortgagee need not hold any interest in the note in order to be

able to foreclose on the mortgage and that disputes between the note holder and the mortgagee do

not affect the status of the mortgagor for purposes of foreclosure by advertisement.  Whether

those holdings are wise, or whether they instead create the risk of double liability cited in

*Culhane* and similar cases, is irrelevant.

---

[15]Although *City of St. Paul* concerned a foreclosure by action, the case also relied on and
interpreted statutes concerning foreclosure by advertisement, including Minn. Stat. § 580.225.
*See City of St. Paul*, 517 N.W.2d at 61 n.1.

Finally, as to Butler's claim that the foreclosure process in Minnesota might somehow violate his clients' federal and state constitutional rights:  Even if these arguments had any merit, they would at best support claims that Butler did *not* bring; they would not justify the frivolous claims that Butler *did* bring.[16]  For example, if Butler actually believed that Minnesota's foreclosure-by-advertisement procedure violated federal and state guarantees of due process, then presumably he would have brought due-process claims challenging the foreclosure process.  He did not.  Indeed, Butler began the hearing in this case by emphatically assuring the Court that he was *not* challenging the foreclosures:  "This complaint is a quiet title complaint.  I don't care about foreclosure by advertisement.  It's not referenced at all in the complaint. . . . I don't particularly care about the foreclosures.  What I care about is the validity of the lien."[17]  Hr'g Tr. 8, 10.  Now, however, when it is time for him to explain why he should not be sanctioned for bringing frivolous claims about "the validity of the lien," Butler expresses concerns about the foreclosure process.  *See* ECF No. 101 at 5 ("[A]t the end of the foreclosure proceedings, the mortgagor, by operation of state law, loses any possible federal remedies against the promissory note holder.  Because it is by operation of state law, the mortgage proceeding may possibly violate the mortgagor's federal and state constitutional rights to due process . . . ."); *id.* at 15 ("*Jackson* did not address issues occurring after the commencement of foreclosure — that is,

---

[16]The same can be said of Butler's purported fear that his clients might be subject to double recoveries.

[17]Butler's assertion that the complaint does not reference foreclosure "at all" is not true; the amended complaint repeatedly attacks defendants' right to foreclose and even specifically mentions plaintiffs' standing to set aside foreclosures by advertisement.  *See* Am. Compl. ¶¶ 40, 46, 48, 92.  The ease with which Butler slides from demonstrably untrue assertion to demonstrably untrue assertion is yet another reason why sanctions against him are warranted.

whether the debt is extinguished after the foreclosure sale.  Simply put, Minnesota law remains unsettled in foreclosure proceedings.").

At the end of the day, then, most of what Butler offers is smoke and mirrors.  Butler's fundamental claim that his clients' mortgages are invalid and that the mortgagees cannot foreclose because they do not hold the notes is utterly frivolous.  Butler's repeated attempts to cloak this claim in new garb are an expensive and time-consuming burden on both the courts and his opponents.  And Butler's litigation conduct — his repeated dismissals and refilings; his delay tactics; his judge shopping; his misrepresentations; his constantly shifting and contradictory arguments; his strategic packaging of large numbers of unrelated plaintiffs into unwieldy cases whose sheer size overwhelms the court and the defendants — all of this is powerful evidence of Butler's bad faith.

The Court therefore finds that Butler has violated Rule 11(b) by "signing, filing, submitting, [and] later advocating" claims and arguments that are neither "warranted by existing law" nor "by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law . . . ."  The Court also finds that Butler has violated Rule 11(b) by presenting claims and arguments "to harass, cause unnecessary delay, [and] needlessly increase the cost of litigation . . . ."  As aptly put by Judge Ann Montgomery:  "While the staggering number of foreclosures amidst the ongoing housing crisis suggests that more than a few banks may have violated homeowners' rights, baseless cases like this one brought by Mr. Butler detract and distract from serious, legitimate claims."  *Murphy v. Aurora Loan Servs., LLC*, No. 11-2750 (ADM/JJK), 2012 WL 104543, at *5 (D. Minn. Jan. 12, 2012).

Indeed, Butler's conduct ultimately detracts from his own clients' claims.  The Court has struggled mightily to determine whether any plaintiff has any legitimate claim that might be buried underneath the pile of frivolous arguments made by their attorney.  The Court has concluded that no such legitimate claim exists.  But even if the Court is wrong, sanctions against Butler would still be warranted.  Butler's pursuit of numerous frivolous arguments and his bad-faith attempts to cause delay and confusion impose needless costs and burdens on the courts and on his opponents.

Under Rule 11(c)(4), a sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  The Court does not believe that a non-monetary sanction would suffice in this case.  Butler's actions are not the result of negligence.  Butler is a very smart and very aggressive lawyer.  He does not suffer from lack of diligence or disorganization.  He does not need a warning to clean up his act or a seminar on how better to manage his case load.  Butler knows exactly what he is doing; he has deliberately chosen to bring hundreds of frivolous claims in the most burdensome manner possible, and he has repeatedly used deceptive and misleading tactics to delay their ultimate resolution.  Only a significant monetary sanction will deter Butler from further misconduct of this kind.  The Court will therefore impose a sanction of $50,000, which Butler will be required to pay into Court.

The amount of this sanction is based on a number of factors, including the extraordinarily egregious and brazen nature of Butler's conduct; the extraordinary burden that he has imposed on this Court and on the opposing parties; the fact that he has not been deterred by warnings or motions for sanctions either in this case or in other pending cases; the fact that he was not deterred by this Court's show-cause order from filing an almost entirely frivolous remand motion

in violation of the local rules and then ambushing his opponents in the course of briefing that motion; and the harm that he has done to his own clients, both by exploiting them financially and by obscuring (and possibly causing them to lose) any legitimate claims they may have had.

As relevant to the last point, the Court notes that, pursuant to its order to show cause, Butler submitted information to the Court regarding the fees that his clients have paid him. Butler's submission reveals that many of Butler's clients pay an initial retainer followed by monthly fees. This corroborates evidence defendants have submitted regarding Butler's marketing practices. *See* ECF No. 113 (June 2010 Internet posting from Butler "looking for groups of people willing to combine resources ($4K down, $400 per month) and stay in their homes until we lift the curtain on the mortgage securitization/bailout fraud. . . . I need groups of individuals who are currently paying to the same lender to make this work. For example 10 people v. Wells, 30 people v. Bank of America, etc.").

The significance of these submissions is three-fold: First, they suggest that Butler's clients may be paying him, not for bringing legitimate claims, but simply for each month that he delays foreclosure by tying up mortgagees in frivolous court proceedings. Second, and relatedly, they suggest that Butler is taking money that his clients might otherwise spend on paying their debts to defendants or finding more affordable housing. And finally, they suggest that Butler makes a substantial part of his living by bringing these frivolous cases. The fees that Butler has earned from this case alone, if multiplied by the number of cases that he has brought, indicate that he has earned tens (or even hundreds) of thousands of dollars marketing show-me-the-note cases over the Internet. A very large monetary sanction is necessary to deprive Butler of the incentive to continue pursuing this illegitimate business model.

The Court also concludes that Butler should be required to pay at least some of defendants' attorney's fees under 28 U.S.C. § 1927.  Section 1927 permits a court to impose fees against an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously . . . ."  There is no doubt that Butler's conduct warrants an award of fees under § 1927.  *See Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004, 1011 (8th Cir. 2006) (§ 1927 permits sanctions "when an attorney's conduct, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court" (citation and quotations omitted)).

Butler contends that he cannot be sanctioned under § 1927 simply for filing a frivolous complaint.  He appears to be correct.  *See, e.g., Jensen v. Phillips Screw Co.*, 546 F.3d 59, 65 (1st Cir. 2008) ("we join an unbroken band of cases across the courts of appeals holding that a lawyer cannot violate section 1927 in the course of commencing an action"); *Macort v. Prem, Inc.*, 208 Fed. Appx. 781, 786 (11th Cir. 2006) ("As an initial matter, the language of § 1927 makes clear that it only applies to unnecessary filings after the lawsuit has begun."); *DeBauche v. Trani*, 191 F.3d 499, 511-12 (4th Cir. 1999) ("We conclude as a matter of law that the filing of a single complaint cannot be held to have multiplied the proceedings unreasonably and vexatiously and therefore that § 1927 cannot be employed to impose sanctions."); *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 435 (9th Cir. 1996) ("The filing of a complaint may be sanctioned pursuant to Rule 11 or a court's inherent power, but it may not be sanctioned pursuant to § 1927.").

But Butler's unreasonable and vexatious conduct in this case went far beyond filing a frivolous complaint.  He continued to advocate frivolous claims both in opposing defendants' motions to dismiss and in filing his initial motion to remand.  And without a doubt, his evasive, contradictory, and often absurd arguments multiplied the length of the hearing on those motions.

At a minimum, therefore, Butler should be required to pay the fees that his opponents incurred in opposing his first remand motion and in replying to his frivolous opposition to their motions to dismiss (as well as in having to appear at the hearing on those motions).[18]  *See Lee v. First Lenders Ins. Servs., Inc.*, 236 F.3d 443, 445 (8th Cir. 2001) (finding a causal connection between the filing of baseless class-action claims and the later multiplication of proceedings); *Salvin v. Am. Nat'l Ins. Co.*, 281 Fed. Appx. 222, 225-26 (4th Cir. 2008) (affirming a § 1927 fee award where plaintiff's counsel failed to dismiss the case after its lack of merit became evident and filed a brief that, among other things, raised new issues not pleaded in the complaint); *Jensen*, 546 F.3d at 65 (noting that, although plaintiff's counsel could not be sanctioned for instituting the action, counsel's knowledge of weaknesses "may inform the question of whether SE & D was guilty down the line of unreasonably and vexatiously multiplying the proceedings").

The Court recognizes that imposing sanctions under Rule 11 as well as fees under § 1927 may appear harsh.  But these provisions serve different purposes.  Section 1927 "does not distinguish between winners and losers" and "is concerned only with limiting the abuse of court processes."  *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 762 (1980), *superseded by statute on other grounds as stated in Morris v. Adams-Millis Corp.*, 758 F.2d 1352, 1357 n.7 (10th Cir. 1985).  In contrast, "the central purpose of Rule 11 is to deter baseless filings in district court . . . ."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).

The main problem with Butler's conduct is that he brought a frivolous lawsuit.  Yet that conduct is not reachable under § 1927.  Nor is it likely that the amount of fees awardable under

---

[18]As discussed above, the Court is separately ordering Butler to show cause why he should not pay the fees and costs incurred by defendants in connection with Butler's second motion to remand.

§ 1927 will be enough, by itself, to deter Butler from continuing to file frivolous lawsuits in the future.  For these reasons, Rule 11 sanctions are warranted and necessary.

But because the Court is imposing Rule 11 sanctions on its own motion, it cannot award fees to defendants under Rule 11.  *See Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 926 (7th Cir. 2004) ("if the [Rule 11] sanction is imposed on the court's own motion, attorney fees cannot be awarded").  Thus, an award of fees under § 1927 is warranted and necessary to remedy at least some of the harm suffered by defendants on account of Butler's vexatious conduct.

The Court has therefore decided to impose both types of sanctions in order to provide both full deterrence of future misconduct and some measure of compensation to Butler's opponents.  In recognition of the fact that Butler will be assessed attorney's fees under § 1927, the Court has imposed a lesser sanction than it would otherwise impose under Rule 11.[19]

## IV.  PLAINTIFF SINGRAMDOO'S MOTIONS

Several weeks after the Court took defendants' motions to dismiss and plaintiffs' motions to remand under advisement, plaintiff Sigmond Singramdoo — now purportedly represented by a new attorney — filed a motion to amend the complaint and a motion for a temporary restraining order to enjoin his impending eviction.  In his proposed new claims, Singramdoo alleges that defendants illegally foreclosed while his application for a loan modification was pending, failed to respond to his qualified written requests in violation of RESPA, and fraudulently modified his

---

[19]The Court notes that Butler has not raised any issue regarding his ability to pay.  *See Willhite v. Collins*, 459 F.3d 866, 870 (8th Cir. 2006) (stating that it is counsel's obligation to raise the issue of his ability to pay a sanction).

loan by failing to verify his income.   None of these claims were so much as hinted at in any of the voluminous pleadings or briefs filed by Butler.

The current group of plaintiffs are probably not properly joined under Fed. R. Civ. P. 20, but there is no doubt that Singramdoo's new proposed claims would render his joinder improper. *See* Fed. R. Civ. P. 20(a) (standard of joinder for plaintiffs, which requires that they assert claims "arising out of the same transaction, occurrence, or series of transactions or occurrences" and that they present a common question of law or fact).   The Court will not permit plaintiffs to further complicate this case by adding individual claims that have nothing to do with each other.   The Court will therefore construe Singramdoo's motion to amend his complaint to be a motion to sever his case.   So construed, the Court will grant the motion and direct the Clerk of Court to docket Singramdoo's proposed amended complaint as a new case.   To pursue his claims, Singramdoo must pay the $350 filing fee required for commencing a case in federal court (or move for permission to proceed in forma pauperis); if he fails to do so, his claims will be dismissed for lack of prosecution.

Finally, with respect to Singramdoo's motion for a temporary restraining order: Singramdoo filed this motion on the afternoon of February 13, less than 24 hours before his scheduled eviction on February 14.   Singramdoo's lack of diligence deprived the Court of any reasonable opportunity to assess the merits of his motion and, as the date for his eviction has now passed, Singramdoo's motion appears moot.   The Court will therefore deny it.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Defendants' motions to dismiss [Docket Nos. 18, 22, 24, 29, and 51] are

        GRANTED, and plaintiffs' amended complaint [Docket No. 20] is DISMISSED

        WITH PREJUDICE AND ON THE MERITS, with the following exceptions:

        a.      The dismissal of plaintiff Heather Welk's claims is stayed pending the

                Court's determination whether it has jurisdiction over those claims.

        b.      Plaintiff Susie Jones's claims for conversion and unjust enrichment against

                defendant GMAC Mortgage, LLC are DISMISSED WITHOUT

                PREJUDICE.

2.      Plaintiffs' motions to remand [Docket Nos. 36, 92] are DENIED except insofar as

        the second motion [Docket No. 92] pertains to Heather Welk's claims.  No later

        than 14 days after the date of this order, each side must file and serve a brief of no

        more than 4,000 words addressing the following issues:

        a.      whether this proceeding is in rem;

        b.      whether an unlawful-detainer action is in rem;

        c.      the current procedural status of the *Welk* unlawful-detainer action;

        d.      whether the pendency of the *Welk* action at the time of removal precludes

                this Court's exercise of jurisdiction over Welk's claims even though the

                *Welk* action is no longer pending; and

-52-

e.       whether attorney William Butler should, pursuant to 28 U.S.C. § 1927, be required to pay the attorney's fees incurred by defendants both in responding to his initial brief in support of his second motion to remand and as a result of the need for this supplemental briefing.

3.       Pursuant to Fed. R. Civ. P. 11, attorney William Butler is ORDERED to pay into Court a sanction of $50,000.  This amount is due and payable immediately.

4.       Defendants' motion for sanctions under 28 U.S.C. § 1927 [Docket No. 72] is GRANTED.

a.       No later than 14 days from the date of this order, defendants must file and serve affidavits attesting to the excess fees and costs they have incurred as a result of attorney William Butler's unreasonable and vexatious multiplication of these proceedings, as identified in the body of this order.

b.       Butler may file and serve a response of no more than 1,000 words to each of those affidavits no later than 21 days from the date of this order.

5.       Plaintiff Sigmond Singramdoo's motion to amend [Docket No. 109] is GRANTED.

a.       The Clerk of Court is directed to docket Singramdoo's proposed amended complaint [Docket No. 109-1] as a new case.

b.       Singramdoo is ORDERED to pay the $350 filing fee or to move for permission to proceed in forma pauperis no later than 14 days from the date of this order.  If Singramdoo fails to do so, his claims will be dismissed without prejudice for lack of prosecution.

6.      Plaintiff Sigmond Singramdoo's motion for a temporary restraining order [Docket No. 110] is DENIED AS MOOT.

7.      Attorney William Butler's motion to withdraw as attorney for plaintiff Sigmond Singramdoo [Docket No. 111] is GRANTED.

8.      Attorney William Butler's motion to withdraw as attorney without substitution for plaintiffs Alison Konobeck and James Willis Konobeck, Jr. [Docket No. 119] is DENIED.

Dated: March 29, 2012                                s/Patrick J. Schiltz
                                                     Patrick J. Schiltz
                                                     United States District Judge