UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| HEATHER L. WELK, SUSIE B. JONES, WILLIAM BIGELOW, CHRISTINE HEINZMAN, MARK HEINZMAN, SIGMOND SINGRAMDOO, TROY FORTE, LYNN M. FORTE, DAVID J. ROSTER, CHARITY ROSTER, PATRICK RUCCI, GARY G. KLINGNER, REBECCA A. ALBERS, IAN PATTERSON, JAMES WILLIS KONOBECK, JR., ALISON KONOBECK, AMY B. TIBKE, DANE A. TIBKE, TRACY J. MIKLAS, and MICHELLE L. MIKLAS, | Case No. 11-CV-2676 (PJS/JJK) |
| Plaintiffs, | CONTEMPT ORDER |
| v. | |
| GMAC MORTGAGE, LLC; ALLY FINANCIAL, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; MERSCORP, INC.; U.S. BANK, N.A.; DEUTSCHE BANK TRUST COMPANY AMERICAS; SHAPIRO & ZIELKE, LLP; U.S. BANK NATIONAL ASSOCIATION ND; DEUTSCHE BANK NATIONAL TRUST COMPANY; THE BANK OF NEW YORK MELLON, f/k/a The Bank of New York, | |
| Defendants. | |

William B. Butler, BUTLER LIBERTY LAW, LLC; Susanne M. Glasser, GLASSER LAW LLC, for plaintiffs.

Charles F. Webber, FAEGRE BAKER DANIELS LLP, for defendants GMAC Mortgage, LLC; Ally Financial, Inc.; MERSCORP, Inc.; Deutsche Bank Trust Company Americas; and The Bank of New York Mellon.

Charles F. Webber, FAEGRE BAKER DANIELS LLP; Bryan A. Welp, LINDQUIST & VENNUM PLLP, for defendant Mortgage Electronic Registration Systems, Inc.

Charles F. Webber, FAEGRE BAKER DANIELS LLP; Brian L. Vander Pol, DORSEY & WHITNEY LLP, for defendants U.S. Bank, N.A.; U.S. Bank National Association ND.

Bryan A. Welp, LINDQUIST & VENNUM PLLP; Jared D. Kemper, FOLEY & MANSFIELD, PLLP, for defendant Deutsche Bank National Trust Company.

On August 8, 2012, this Court ordered plaintiffs' attorney, William B. Butler, to pay a $50,000 sanction to the Court and a total of $29,766.70 in attorney's fees to defendants. ECF Nos. 140, 141; *see also Welk v. GMAC Mortg., LLC*, 850 F. Supp. 2d 976, 999-1006 (D. Minn. 2012). The Court assessed these sanctions after finding that Butler had engaged in "extraordinarily egregious and brazen" misconduct, 850 F. Supp. 2d at 1004, including making numerous frivolous arguments in this case, creating a "cottage industry of filing frivolous show-me-the-note claims," *id.* at 999, engaging in "brazen delay tactics and judge-shopping," *id.*, and making "misrepresentations" to this Court, *id.* at 1003. The United States Court of Appeals for the Eighth Circuit affirmed this Court's judgment and issued its mandate on August 7, 2013. On August 12, 2013, this Court ordered Butler to pay the sanctions by August 30, 2013.

Butler did not pay any part of the sanctions. Instead, Butler filed a letter stating that he was financially unable to pay the sanctions. The Court thereafter ordered Butler to appear at an evidentiary hearing to show cause why he should not be held in contempt. On December 17, 2013, the Court held an evidentiary hearing, at which the Court received a great deal of evidence about Butler's financial condition. The Court then took the matter under advisement.

Nine days later, Butler was suspended from practicing law before the Eighth Circuit. *In re Butler*, No. 13-9013 (8th Cir. Dec. 26, 2013) (order of suspension). As a result, Butler was automatically suspended from practicing law before this Court. *See* Local Rule 83.6(b)(1)

("Unless otherwise ordered by this Court, any such attorney who has been temporarily or permanently prohibited from practicing law by order of any other court, whether by suspension, revocation, or disbarment, shall automatically forfeit his or her right to practice law before this Court during the same period that such attorney has been prohibited from practicing law by such other court.")

Based on the record before the Court, and for the reasons explained below, the Court finds that Butler is in contempt. As discussed below, however, the Court will not take action against Butler until it can determine whether his suspension from the practice of law succeeds in compelling him to make a good-faith effort to pay the sanctions. The Court will, however, ask the United States Attorney to pursue collection of the sanctions from Butler and to investigate whether Butler should be charged with criminal contempt.

### A. Legal Standard

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966).[1]  For a court to hold a

---

[1] At the December 17 contempt hearing, Butler challenged the Court's subject-matter jurisdiction over this case, implicitly contending that the Court's order requiring him to pay sanctions was not "lawful." Hr'g Tr. 32, Dec. 17, 2013. Butler's argument was that, because three of the many properties involved in this case are registered under the Torrens Act, the state court has exclusive jurisdiction over this action. Butler's argument is meritless. *See Novak v. JP Morgan Chase Bank, N.A.*, No. 12-589 (DSD/LIB), 2012 WL 3638513, at *3 (D. Minn. Aug. 23, 2012), *aff'd*, 518 Fed. Appx. 498 (8th Cir. 2013).

The Court also notes that, shortly before the evidentiary hearing, several plaintiffs filed requests for the Court to take judicial notice of various matters, all of which have to do with the merits of the underlying case. But the underlying case was long ago dismissed by the Court (with the minor exception of certain claims subject to a bankruptcy stay), and that dismissal was affirmed on appeal. These last-minute requests are therefore both irrelevant and not properly before the Court.

party in civil contempt, there must be clear and convincing evidence of a violation of a court order. *Chicago Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000) (*Chicago Truck Drivers I*). Once a violation is proven, the burden shifts to the violator to show that compliance is presently impossible. *United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 736 (8th Cir. 2001). To meet this burden, violators must demonstrate "'(1) that they were unable to comply, explaining why categorically and in detail, (2) that their inability to comply was not self-induced, and (3) that they made in good faith all reasonable efforts to comply.'" *Id.* (quoting *Chicago Truck Drivers I*, 207 F.3d at 506).

### B. Analysis

#### 1. Evidence of Inability to Comply

There is no dispute that Butler did not comply with the Court's August 12, 2013 order. Accordingly, Butler bears the burden of demonstrating that it was impossible for him to comply. Butler offers no evidence of his inability to comply, however, save for the following testimony, which the Court quotes in its entirety:

> The very short answer to the question of whether or not — or why I haven't paid $80,000 in sanctions is that I am unable to comply. At no time since this Court's order have I had $80,000 or anywhere near $80,000. I've given opposing counsel all of my bank records, all of my financial records. There's no — I don't think there's any evidence that I've ever had $5,000 accumulated, and that's not any kind of intent to avoid any sanctions. The way I operate my life is money comes through and comes out to pay expenses. And I don't have any desire to accumulate dollars period. That goes before this order and after this order.
>
> If I had had or would win the lottery, as I testified in my deposition, what I would like to do is I'd like to deposit it in an interpleader action and then challenge the validity of the order. But in terms of paying, I have never had the money and don't have

> the money. And so it is therefore, in accordance with *U.S. v. Santee*, impossible for me to comply with the order.
>
> I do want to apologize to the Court in that I don't think we provided the Court with this evidence or information timely to allow the Court to determine this. I think probably the Court assumed that we've got a lot of clients, we must be making a lot of money, and Mr. Butler must be putting a lot away and therefore we have to set a high sanctions amount to stop this. That was never the case and never has been the case.
>
> And, again, I don't intend to submit any documents. This is my word. And I provided all my financials to opposing counsel. I don't have the money, never had it. That's all I have.

Hr'g Tr. 7-8, Dec. 17, 2013.

The Court finds this testimony insufficient to meet Butler's burden. To begin with, a conclusory assertion that the contemnor lacks the money to pay court-imposed sanctions does not come close to meeting *Santee*'s requirement that the contemnor explain "categorically and in detail" why he is unable to comply.

Indeed, Butler's testimony reflects a fundamental misunderstanding of the nature of his obligation. Butler seems to believe that he is free to ignore court-imposed sanctions unless, at some time in the future, he has purchased whatever he feels like purchasing and paid whatever expenses he feels like paying, and then discovers that he has left over in his bank account the full amount of the sanctions, or something close to it. The law is not so toothless; a party in Butler's position must pay sanctions *before* paying any other bills. Indeed, far from being a defense, Butler's decision to pay other expenses instead of paying the sanctions is grounds for holding him in contempt. *Cf. Chicago Truck Drivers v. Bhd. Labor Leasing*, 406 F.3d 955, 958 (8th Cir.

2005) (law firm that advised client to pay other expenses rather than make court-ordered payments was complicit in client's contempt and consequently could also be held in contempt).

Even if a conclusory assertion of an inability to pay could theoretically be sufficient to avoid a finding of contempt, it would not be sufficient in this particular case, because Butler was not a credible witness. Butler's testimony on cross-examination was marked by long pauses and evasive answers to even the most basic questions. It was apparent that Butler was often weighing the strategic implications of his contemplated answers rather than simply trying to provide a truthful answer to the question. Butler also made a number of highly improbable claims. For example, Butler claimed not to remember whether he filed any tax returns for 2011 and 2012, Hr'g Tr. 74, and similarly claimed that he was "not certain" whether he is the only member of a limited-liability company that he formed in March 2012, Hr'g Tr. 39.

Even if the Court ignored Butler's evasions during the contempt hearing, the Court would still not find Butler credible because he has shown himself to be dishonest in his representations to this Court and in his public statements about his activities in this Court. In its March 29, 2012 order imposing sanctions on Butler, the Court noted the "ease with which Butler slides from demonstrably untrue assertion to demonstrably untrue assertion . . . ." ECF No. 121 at 44 n.17. Butler has continued to display the same ease since the Court made that observation. To cite a very few examples:

1. In a brief dated August 29, 2013 that Butler submitted both to the Eighth Circuit and to this Court, Butler asserted that he "now draw[s] no personal income from" his law firm. Def. Ex. 2 at 7. But under cross-examination at the evidentiary hearing, Butler admitted that, although his law firm no longer makes payments directly to him, it does make weekly payments to a

corporation that Butler established called the Church of Jesus Christ and Latter Day Austrian Economists, Inc. ("the Church"). Hr'g Tr. 51. The only real function of the Church — of which Butler is the sole shareholder — is to pay Butler's personal living expenses.[2] Hr'g Tr. 36-37, 51-53. Specifically, Butler pays his personal expenses using a debit card issued by the Church. Hr'g Tr. 51-52. Butler's assertion that he draws no income from his law firm was therefore false. Butler does indeed draw income from the firm; he simply has his firm (which he fully controls) funnel his income through the Church (which he also fully controls).

    2. Butler also made a number of misrepresentations in a January 2013 videotaped presentation to potential clients, which he posted on his website, and which was admitted as evidence during the contempt hearing. *See* Def. Ex. 25. It would take a small book to describe every false and misleading statement made by Butler in the course of his presentation, but among the more egregious examples were the following:

    a. Butler asserted that he has never brought a "show me the note" case. *See* Def. Ex. 25 at 2:20. As the Court has already detailed elsewhere, however, the main thrust of this case (and dozens of other cases brought by Butler) has always been a show-me-the-note argument — that is, an argument that the holder of a mortgage cannot foreclose on that mortgage unless it also holds the promissory note secured by the mortgage. *See* ECF No. 121 at 8 (quoting Butler's show-me-the-note arguments). Butler's repeated attempts to obfuscate the nature of his claims

---

[2] Despite its ostensibly religious name, the Church is not a § 501(c)(3) organization under the Internal Revenue Code. Hr'g Tr. 36. Butler claimed that the Church also engages in certain pro bono activities. Butler was not clear about these alleged pro bono activities, but it was apparent that these activities are minimal at best, and that the main function of the Church is to serve as a conduit of money from Butler's law firm to Butler. Hr'g Tr. 36-38, 51-53.

are not only misleading, but they demonstrate Butler's awareness that the legal theory underlying this case lacks any merit.

   b. Butler contended that his claims have never been challenged on the merits because they have all been dismissed on Rule 12 motions. Def. Ex. 25 at 2:55. As any lawyer knows, however, a Rule 12 motion for failure to state a claim *is* a challenge on the merits: It is an argument that, even if all of the plaintiff's allegations are true, the plaintiff's claims should be dismissed because they are meritless. Butler's contrary statements to his audience, which presumably consisted of non-lawyers, were disingenuous at best.

   c. Butler repeatedly touted a case that he worked on almost 20 years ago — *First National Bank of Elk River v. Independent Mortgage Services*, No. DX-95-1919, 1996 WL 229236 (Minn. Ct. App. May 7, 1996) — as some kind of watershed case on securitized mortgages. *See, e.g.*, Def. Ex. 25 at 1:50, 5:25. Butler's references to *First National Bank* were highly misleading. *First National Bank* was a dispute between a bank that originated two mortgages and an entity that purported to buy the mortgages. *Id.* at *1. Butler represented the bank, which succeeded in proving that it still owned the mortgages because the other party had never paid for them. *Id.* at *4. In other words, *First National Bank* was a simple case of a sale failing because the buyer failed to pay the seller for the things that it purchased. The mortgages were not in foreclosure, and nobody was challenging their validity. Nor did anyone claim that the mortgages had to be held in common with the underlying promissory notes. Indeed, contrary to Butler's repeated assertions, the case did not even involve securitized mortgages. Other than the fact that it involved banks and mortgages, *First National Bank* has nothing in common with this or any of Butler's other show-me-the-note cases.

    d. Butler contended that before he was sanctioned in this case, "not one lawyer of any bank" had sought sanctions against him.³ Def. Ex. 25 at 4:15. That is demonstrably false. At the time this Court issued its order requiring Butler to show cause why he should not be sanctioned, counsel had already sought sanctions against him in at least three cases (including this one). ECF No. 72; *Murphy v. Aurora Loan Servs., LLC*, 11-2750 (ADM/JJK), ECF No. 39 (D. Minn. Dec. 19, 2011) (motion for sanctions); *Cartier v. Wells Fargo Bank, N.A.*, No. 11-2168 (JRT/AJB), ECF No. 1-11 (D. Minn. Aug. 1, 2011) (notice of motion dated February 23, 2011 and removed to federal court August 1, 2011).

    e. In describing the sanctions that were imposed in this case, Butler asserted that this Court sanctioned him at the end of the January 2012 hearing on defendants' motions to dismiss. Def. Ex. 25 at 3:55; Hr'g Tr. 84. Butler implied that he was ambushed by this Court and not given a fair opportunity to defend himself. Both what Butler said and what Butler implied were untrue. As Butler well knows, the Court did not impose any sanctions at the hearing. Instead, after the hearing concluded, the Court issued a written order notifying Butler that it was considering imposing sanctions and inviting Butler to submit a brief explaining why he should not be sanctioned. ECF No. 91. Butler then retained a lawyer, and Butler's lawyer filed a memorandum in which he made numerous arguments for why Butler should not be sanctioned. ECF No. 101. Several weeks later, the Court issued a lengthy written order that, after addressing each of Butler's arguments on the merits, imposed sanctions and explained the basis for those

---

³Butler's actual words were "prior to that, not one lawyer of any bank" had sought sanctions against him. Def. Ex. 25 at 4:15. In context, it is clear that he meant "prior to" this Court's sanction.

sanctions. ECF No. 121. In short, Butler completely misrepresented the sequence of events that led to his being sanctioned in this case.

As these examples illustrate, Butler has made numerous misrepresentations to this Court and to the public, including misrepresentations about his conduct as a lawyer, the sanctions imposed in this case, and his financial affairs. For that reason, the Court gives no weight to Butler's conclusory testimony that he cannot afford to pay the sanctions in this case.

### 2. Evidence of Ability to Comply

As noted, Butler has the burden of proving that he cannot afford to pay any part of the sanctions assessed against him, and the only evidence that he has offered is testimony about his financial condition that the Court does not believe. That is sufficient, without more, to find that Butler is in contempt. The Court notes, however, that there is ample evidence in the record that Butler is, in fact, able to pay the sanctions — which is further evidence of Butler's dishonesty.

Between February 2012 and October 2013, Butler's legal practice generated over $1.35 million, for an average monthly gross of over $64,000. *See* Def. Ex. 4. This income is reflected in Butler's personal bank records as well as in the records of three entities — Butler Liberty Law, LLC; the Church; and Liberty Mortgage Research, LLC. Butler objects to the Court's consideration of anything other than his personal bank records, but the evidence demonstrates that Butler established and fully controls all three entities and that all of their income is generated by Butler's legal work. *See* Hr'g Tr. 33-40, 44, 45-46, 51-53. Indeed, it was clear at the hearing — and Butler himself all but admitted at his deposition — that Butler formed Liberty Mortgage Research, LLC for the very purpose of shielding his assets from (i.e., evading)

court sanctions. Hr'g Tr. 41-44, 67. All of this income, therefore, represents money that was available to Butler to pay his sanctions.

Even if the Court were limited to considering Butler's personal income — that is, even if the Court were to ignore the income of Butler's firm and the other entities that he controls — the Court would nevertheless find that Butler was able to pay at least a portion of the sanctions. In March 2013, as part of his divorce settlement, Butler stipulated that he nets $6,000 to $7,200 in personal income per month. Def. Ex. 26 at 3 ¶ 13. Clearly someone who nets $6,000 to $7,200 every month is able to pay at least *some* part of the sanctions assessed against him.

As discussed above, Butler argues that, in determining whether he is able to pay sanctions, the Court must look not only at his income, but also at his expenses. As the Court has already explained, Butler is incorrect about the law. But even if Butler were correct — that is, even if someone in Butler's position could avoid contempt by showing that all of his income was used to pay necessary living expenses — the Court would still hold Butler in contempt, as he has not come close to showing that all of his income was used to pay such expenses. To the contrary, the evidence makes clear that Butler's expenses have far exceeded what is necessary to provide for his basic needs.

From August 12 to August 30, 2013, while Butler was under a court order to pay sanctions by the end of the month, he spent $1,502.12 on restaurant meals, liquor, and yoga. Def. Ex. 19 at 19-21; Hr'g Tr. 62-64. In September 2013, immediately after informing this Court that he did not have the resources to pay sanctions, that he had not paid rent on his office for four months, and that his adult son was on food stamps, *see* Def. Ex. 2 at 7-8, Butler spent $1,718.46 on restaurant meals, liquor, yoga, tanning, and kettlebell equipment. Def. Ex. 19 at 21-23, 26-28.

In that same month, he spent an additional $488.91 at pet stores and $699.50 at Brooks Brothers, for a total of $2,906.87. Def. Ex. 19 at 22, 26-27. All told, in the less-than-two-month period during and immediately after Butler was supposed to pay the sanctions, his discretionary spending exceeded $4,400. This level of spending is apparently not unusual for Butler; in his divorce settlement, which he signed in March 2013, Butler claimed that he spent $1,500 per month just on groceries. Def. Ex. 26 at 4.

In addition to direct evidence of Butler's discretionary expenditures, there is evidence suggesting that Butler's firm takes in substantially more than its operating expenses. Back in July 2012 — in response to a motion to hold him in contempt in a different case — Butler offered a declaration from his bookkeeper stating that his firm had $16,662.10 in the bank, which, according to the bookkeeper, was sufficient for "the firm [to] function, at best, for two weeks." Def. Ex. 24; Hr'g Tr. 76-78. If $16,662.10 represents two weeks' worth of operating expenses, then the firm's monthly operating expenses are somewhere around $37,000. As noted, since February 2012 Butler's firm has had an average monthly gross of over $64,000, well in excess of that amount. Def. Ex. 4. This evidence completely contradicts Butler's claim in July 2012 that his firm was in financial trouble — and completely contradicts Butler's testimony in this proceeding that his firm is "hand to mouth cash-wise . . . ." Hr. Tr. 89.

For all of these reasons, the Court finds that Butler has had and continues to have the ability to pay the sanctions that have been imposed on him and has simply refused to do so.

3. Good Faith

Butler obviously did not make a good-faith attempt to comply with the Court's August 12, 2013 order because Butler made *no* attempt to comply with that order. Butler did not pay a single penny of the sanctions despite overwhelming evidence that he could easily have done so. Indeed, in the January 2013 video, Butler vowed to his prospective clients that he "never will pay" the sanctions against him. Def. Ex. 25 at 3:55; Hr'g Tr. 84. Far from making a good-faith attempt to pay the sanctions, Butler has openly flouted them — and used his defiance as a marketing tool to attract new clients.

In summary, then, Butler has failed to carry any part of his burden. He has shown neither that it was impossible for him to pay the sanctions nor that he made a good-faith effort to do so. And given the evidence of his substantial discretionary spending, Butler has also failed to show that any inability to comply was not self-induced. The Court therefore holds Butler in contempt.

4. Remedy

A court may use its civil contempt power to coerce the contemnor to comply with a court order. *Chicago Truck Drivers I*, 207 F.3d at 505. Although coercive remedies typically take the form of incarceration or a fine, courts have broad power to craft a remedy appropriate to the circumstances.[4] "The only limitation is that in a civil proceeding, the sanctions must not be penal

---

[4] *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193-94 (1949) ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief. They may entail the doing of a variety of acts, such as the production of books."); *Texas v. Ysleta Del Sur Pueblo*, 431 Fed. Appx. 326, 329-31 (5th Cir. 2011) (affirming order requiring Indian tribe to allow state representatives to conduct monthly inspections of casino's books and records); *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 520 (9th Cir. 1992) (affirming, as modified, order banning a company from engaging in surplus aircraft-parts business and requiring it to destroy infringing goods); *NLRB v. Aquabrom, Div. of Great Lakes*
(continued...)

in nature, but must be coercive or remedial." *Aquabrom*, 855 F.2d at 1187. The hallmark of a civil contempt remedy is that the contemnor can avoid it by complying with the court's order and thereby purge himself of contempt. *Jake's, Ltd. v. City of Coates*, 356 F.3d 896, 902 (8th Cir. 2004).

As noted, courts often impose fines or jail time as a coercive remedy for civil contempt. *See Klett v. Pim*, 965 F.2d 587, 590 (8th Cir. 1992) (noting coercive remedies "such as a fine or jailing"). In this case, however, it is clear that a fine would be useless. For nearly two years, Butler has ignored the sanctions imposed in this case while incurring yet more sanctions from other judges in this District. Moreover, Butler has already been held in contempt in another case for failing to pay sanctions, and the fine imposed in that case has had no effect on Butler. *Murphy*, No. 11-2750, ECF No. 106 (D. Minn. Sept. 4, 2012).

The Court considered ordering that Butler be incarcerated, but, in the Court's view, incarceration should be a last resort, imposed only after less drastic measures have failed. The Court therefore concluded that, before ordering that Butler be incarcerated, it would attempt to compel compliance by suspending Butler from practicing law in this District until such time as he demonstrated at least a good-faith effort to pay the sanctions.

As noted, though, shortly after the evidentiary hearing in this case, the United States Court of Appeals for the Eighth Circuit suspended Butler from practicing before that court because of his failure to make any effort to pay any of the hundreds of thousands of dollars in

---

[4](...continued)
*Chem. Corp.*, 855 F.2d 1174, 1187-88 (6th Cir.) (requiring company to bargain with union and submit written status reports to a special master), *modified*, 862 F.2d 100 (6th Cir. 1988); *Lance v. Plummer*, 353 F.2d 585, 591-92 (5th Cir. 1965) (affirming, as modified, order requiring volunteer deputy sheriff to surrender his badge).

sanctions that have been imposed on him by judges of this District. *In re Butler*, No. 13-9013 (8th Cir. Dec. 26, 2013) (order of suspension). Consequently, Butler has automatically been suspended from the practice of law before this Court. *In re Butler*, 13-MC-0049 (MJD), ECF No. 10 (D. Minn. Jan. 14, 2014).

As a result of the action of the Eighth Circuit and his automatic suspension from practice in this District, Butler is already under the same compulsion to pay the sanctions that this Court had intended to impose. For that reason, the Court will not take further action against Butler at this time. The Court will instead monitor whether Butler makes good-faith efforts to pay the sanctions as a result of his suspension from the practice of law in the Eighth Circuit and this District. If he does not make such efforts, the Court will revisit the question of whether incarceration is necessary to compel Butler to pay the sanctions that he has been assessed in this case.

In the meantime, however, the Court will refer this matter to the United States Attorney for the District of Minnesota. Given the brazen nature of Butler's contempt, given the actions that he has taken to evade the sanctions that have been imposed on him, and given the misrepresentations that he has made in defense of his failure to pay those sanctions, the Court asks the United States Attorney to consider whether criminal proceedings should be initiated against Butler. Moreover, the Court asks the United States Attorney to consider whether to use liens, attachments, garnishments, or other remedies to collect Butler's debt to this Court.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Attorney William B. Butler is HELD IN CONTEMPT for his failure to comply with the Court's August 12, 2013 order [ECF No. 157].

2. The Court will defer a decision on the appropriate remedy for Butler's contempt until the Court is able to determine whether Butler makes a good-faith effort to pay his sanctions as a result of the suspension imposed under D. Minn. L.R. 83.6(b)(1).

Dated: January 21, 2014                                s/Patrick J. Schiltz
                                                                                          Patrick J. Schiltz
                                                                                          United States District Judge